# 13-2187-BK

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

IN RE: MOTORS LIQUIDATION COMPANY, *et al.*,

*Debtors.*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF MOTORS LIQUIDATION COMPANY,

*Plaintiff-Appellant,*

*v.*

JPMORGAN CHASE BANK, N.A., INDIVIDUALLY AND AS ADMINISTRATIVE AGENT
FOR VARIOUS LENDERS PARTY TO THE TERM LOAN AGREEMENT DESCRIBED HEREIN,

*Defendant-Appellee.*

*On Appeal from the United States Bankruptcy Court
for the Southern District of New York (New York City)*

## BRIEF FOR PLAINTIFF-APPELLANT

Eric B. Fisher
Barry N. Seidel
Katie L. Weinstein
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019
(212) 277-6500
*and*
Jeffrey Rhodes
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, D.C. 20006
(202) 420-3150

*Attorneys for Plaintiff-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, the Motors Liquidation Company Avoidance Action Trust (the "Trust") hereby states it is a private entity that has no parent corporation, and there is no publicly held corporation that owns 10% or more of the Trust.

<u>**TABLE OF CONTENTS**</u>

**PAGE**

TABLE OF AUTHORITIES .................................................................iv

SUBJECT MATTER AND APPELLATE JURISDICTION....................................1

PRELIMINARY STATEMENT ........................................................2

ISSUES PRESENTED ..................................................................8

STATEMENT OF THE CASE......................................................9

STATEMENT OF FACTS .........................................................13

A.     The DIP Order Is Entered And The Term Loan Lenders Are Repaid ..............................................................................13

B.     JPMorgan's Counsel Prepares The Robert Gordon Affidavit To Dissuade The Committee From Challenging The Term Loan Lenders' Security Interest................................................14

C.     The Committee Discovers The Circumstances Surrounding The Filing Of The 2008 Termination Statement ................................15

     1.     The Term Loan....................................................15

     2.     The Synthetic Lease ............................................16

D.     The Synthetic Lease Is Paid Off And The 2008 Termination Statement Is Filed ..................................................................18

     1.     The 2008 Termination Statement Is Included On A Closing Checklist Sent To Simpson Thacher And JPMorgan...........................................................18

     2.     The Draft 2008 Termination Statement Is Sent To Simpson Thacher And JPMorgan ................................21

     3.     Simpson Thacher Executes An Escrow Letter Authorizing The Release Of The 2008 Termination Statement To Mayer Brown ............................22

E.     After The Petition Date, JPMorgan's Counsel Raises Questions About The 2008 Termination Statement ....................................24

F.     The Bankruptcy Court's Decision ............................................26

SUMMARY OF THE ARGUMENT ...................................................28

ARGUMENT ..............................................................................32

A.  Standard Of Review..............................................................32

B.  The Bankruptcy Court Erred In Concluding That The 2008
    Termination Statement Was Not Legally Effective .......................32

    1.  The UCC Requires Only That A Secured Party Authorize
        The Act Of Filing A Termination Statement, Not The
        Legal Consequences .......................................................33

    2.  The Undisputed Facts Establish That JPMorgan
        Authorized The Filing Of The 2008 Termination
        Statement ....................................................................35

        (a)  Closing Checklist ....................................................37

        (b)  Draft 2008 Termination Statement ...............................39

        (c)  Escrow Letter ........................................................41

        (d)  Termination Agreement ...........................................43

C.  Mayer Brown Reasonably Believed That JPMorgan Authorized
    The Filing Of The 2008 Termination Statement At The Time ..........44

    1.  The Bankruptcy Court Overlooked Key Testimony From
        Mayer Brown's Ryan Green ..............................................45

    2.  The Bankruptcy Court Misconstrued The Gordon
        Affidavit ......................................................................47

    3.  The Hoge Affidavit Is Irrelevant........................................48

D.  Secured Creditors Are Bound By Their Mistakes Under
    Revised Article 9 Of The UCC..................................................49

E.  Mutual Mistake Is Not Applicable ............................................58

F.  The UCC Remains A System Designed To Give Public Notice..........60

CONCLUSION ...........................................................................62

## <u>TABLE OF AUTHORITIES</u>

**CASES**          **PAGE(S)**

*ACF 2006 Corp. v. Merritt*, No. CIV-12-161, 2013 WL 466603
(W.D. Okla. Feb. 7, 2013) ................................................................59, 61

*Air Line Pilots Ass'n, Int'l v. Shugrue (In re Ionosphere Clubs, Inc.)*,
22 F.3d 403 (2d Cir. 1994) ....................................................................32

*Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn
Fuels, LLC)*, 492 B.R. 445 (Bankr. M.D.N.C. 2013) ..........................60

*Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d
1242 (4th Cir. 1992)....................................................................50, 51, 59

*Demarco v. Edens*, 390 F.2d 836 (2d Cir. 1968) ................................37, 41

*FDIC v. Providence Coll.*, 115 F.3d 136 (2d Cir. 1997) ..........................32

*Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp.
(In re Blackwood Assocs.)*, 153 F.3d 61 (2d Cir. 1998) ......................32

*In re A.F. Evans Co.*, No. 09-41727 (EDJ), 2009 WL 2821510 (Bankr.
N.D. Cal. July 14, 2009), *aff'd sub nom. Official Comm. of
Unsecured Creditors v. City Nat'l Bank*, No. C09-03817 (MMC),
2011 WL 1832963 (N.D. Cal. May 13, 2011)......................................56, 57, 58

*In re Hampton*, No. 99-60376, 2001 WL 1860362 (Bankr. M.D. Ga.
Jan. 2, 2001)............................................................................................53

*In re Lortz*, 344 B.R. 579 (Bankr. C.D. Ill. 2006) ...................................59

*In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987 (Bankr. M.D. Fla.
1992) ....................................................................................50, 52, 61

*Koehring Co. v. Nolden (In re Pac. Trencher & Equip., Inc.)*, 27 B.R.
167 (B.A.P. 9th Cir. 1983), *aff'd*, 735 F.2d 362 (9th Cir. 1984)......51, 52, 58, 59

*Lange v. Mut. of Omaha Bank (In re Negus-Sons, Inc.)*, Bankr. Case
No. 09-82518 (TJM), Adv. Pro. Case No. 10-8064 (TJM), 2011
WL 2470478 (Bankr. D. Neb. June 20, 2011), *aff'd*, 460 B.R. 754
(B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012).........54, 55

*Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 457 B.R. 29 (B.A.P. 9th Cir. 2011) ..............36, 42

*Peoples Bank of Ky., Inc. v. U.S. Bank, N.A. (In re S.J. Cox Enters., Inc.)*, Bankr. Case No. 07-50705, Adv. Pro. Case No. 08-5066, 2009 WL 939573 (Bankr. E.D. Ky. Mar. 4, 2009)............................54

*Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York Chem. Indus., Inc.)*, 30 B.R. 583 (Bankr. D.S.C. 1983) .........................51, 52

*Roswell Capital Partners LLC v. Alt. Constr. Techs.*, No. 08 Civ. 10647 (DLC), 2010 WL 3452378 (S.D.N.Y. Sept. 1, 2010), *aff'd*, 436 F. App'x 34 (2d Cir. 2011) ............................................50, 54, 60

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994) ........................................................................32

*Ward v. Bank of Granite & Hickory Printing Solutions LLC (In re Hickory Printing Grp., Inc.)* 479 B.R. 388 (Bankr. W.D.N.C. 2012) ........................................................................54, 55, 56

## STATUTES

11 U.S.C. § 544(a) ........................................................................10

28 U.S.C. § 157 ............................................................................1

28 U.S.C. § 158(d)(2)(A) ...............................................................1

28 U.S.C. § 1334 ..........................................................................1

Del. Code Ann. tit. 6, § 9-101 *et seq.* ......................................4

Del. Code Ann. tit. 6, § 9-509.....................................................35

Del. Code Ann. tit. 6, § 9-509(d)(1) .............................3, 33, 34

Del. Code Ann. tit. 6, § 9-510(a) ..............................................33

Del. Code Ann. tit. 6, § 9-513(d) ........................................33, 34

**RULES**

Fed. R. App. P. 5 ..............................................................................1

Fed. R. Bankr. P. 8001(f) ................................................................1

Fed. R. Bankr. P. 8001(f)(5) ...........................................................1

Fed. R. Bankr. P. 8002 .....................................................................1

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 1.03 (2006).............................36

Restatement (Third) of Agency § 2.01 (2006).......................35, 36

Restatement (Third) of Agency § 3.01 (2006).............................35

## <u>SUBJECT MATTER AND APPELLATE JURISDICTION</u>

The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") had jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11*, dated July 10, 1984 (Ward, Acting C.J.) as amended by *Standing Order M-431*, dated February 1, 2012 (Preska, C.J.). On March 1, 2013, the Bankruptcy Court entered judgment (the "Judgment") in the action. (Special Appendix ("SPA"), SPA80-81). On that same date, the Bankruptcy Court, *sua sponte*, certified the Judgment for direct appeal to this Court on all three grounds specified in 28 U.S.C. § 158(d)(2)(A). (Joint Appendix ("A"), A3561-62).

On March 7, 2013, the Trust timely filed a notice of appeal from the Judgment (A3563-64), pursuant to Fed. R. Bankr. P. 8002, thereby making the certification effective under Fed. R. Bankr. P. 8001(f). On April 5, 2013, in accordance with Fed. R. Bankr. P. 8001(f)(5) and Fed. R. App. P. 5, the Trust timely filed its petition for permission for direct appeal. (A3565-757). On June 5, 2013, this Court granted the petition. (A3780). This Court has jurisdiction over this direct appeal pursuant to 28 U.S.C. § 158(d)(2)(A).

## PRELIMINARY STATEMENT

Although the dollar amount at issue on this appeal is substantial, the core legal issue is simple. The issue is whether JPMorgan Chase Bank, N.A. ("JPMorgan") authorized Mayer Brown LLP ("Mayer Brown") to file a certain UCC termination statement relating to the Term Loan (as defined herein) to General Motors Corporation ("GM"). Contrary to the Bankruptcy Court's ruling, the undisputed facts establish that JPMorgan did, in fact, authorize the filing of the 2008 Termination Statement (as defined herein), thereby causing the security interest collateralizing the Term Loan to become unperfected. Because the Term Loan lenders did not have a perfected security interest in the collateral securing the Term Loan at the time of GM's bankruptcy filing, they should not have been paid ahead of unsecured creditors of GM, whose interests are represented in this case by the Trust, as successor to the court-appointed Official Committee of Unsecured Creditors of Motors Liquidation Company (the "Committee").

The key facts establishing that JPMorgan authorized Mayer Brown to file the 2008 Termination Statement are not in dispute. At the time the 2008 Termination Statement was filed, GM and JPMorgan were working together to close a transaction that was unrelated to the Term Loan, involving GM's payoff of a 2001 "synthetic lease" financing arrangement. In connection with the payoff of the synthetic lease financing, Mayer Brown, acting as GM's counsel, prepared and

circulated, and JPMorgan and its counsel received and approved, drafts of UCC-3 termination statements – including a draft of the 2008 Termination Statement – and several versions of a closing checklist, all of which explicitly indicated that the 2008 Termination Statement would be filed.  In written communications with Mayer Brown, JPMorgan's counsel approved these closing documents, including the 2008 Termination Statement.  JPMorgan's counsel also executed an escrow letter that authorized the release of the 2008 Termination Statement to Mayer Brown.

Consistent with the above, on October 30, 2008, upon the closing of the payoff of the synthetic lease, Mayer Brown transmitted a number of UCC-3 termination statements, including the 2008 Termination Statement, to the Delaware Secretary of State for filing.  On that same date, all of those UCC-3 termination statements, including the 2008 Termination Statement, were filed.

As it turned out, the draft 2008 Termination Statement approved by JPMorgan had been prepared by Mayer Brown in error.  Similarly, the closing checklist approved by JPMorgan and the escrow instructions signed by JPMorgan's counsel both listed the 2008 Termination Statement in error. Nonetheless, because JPMorgan, the "secured party of record," "authorize[d] *the filing*," Del. Code Ann. tit. 6, § 9-509(d)(1) (emphasis added), it was a legally

3

effective filing.  Courts have long recognized that erroneous termination statements are legally effective as long as they have been properly filed.

Prior to the 2001 amendments, a termination statement had to be signed by the secured party of record (or its assignee) prior to filing in order to be authorized and thus effective.  In 2001, Article 9 of the Uniform Commercial Code (the "UCC")[1] was revised to eliminate the requirement that the secured party sign the termination statement.  Now, under the revised UCC applicable here, the secured party's signature is no longer required, and any person may file a termination statement so long as the secured party authorizes the filing.  If the filing of the termination statement is authorized by the secured party, it has the effect of terminating the initial financing statement to which it relates and causing the subject security interest to become unperfected.

Notwithstanding that JPMorgan approved the filing of the 2008 Termination Statement, the Bankruptcy Court granted JPMorgan's motion for summary judgment below, concluding that the filing of the termination statement was not "authorized" and was therefore ineffective.  According to the Bankruptcy Court, because JPMorgan mistakenly believed that the termination statement related to

---

[1] In the proceedings before the Bankruptcy Court, the parties principally addressed New York and Delaware UCC law in their summary judgment briefs.  The UCC sections applicable to this matter are substantively the same in both states.  For ease of reference, the Trust refers only to Delaware's UCC statutes (Del. Code Ann. tit. 6, § 9-101 *et seq.*) in this brief.

the 2001 synthetic lease financing, and did not intend the legal consequences that

resulted from the filing of the 2008 Termination Statement – *i.e.*, termination of the

initial financing statement related to the Term Loan Lenders' security interest –

JPMorgan could not be found to have authorized the filing even though it

"arguably consented to the filing." (SPA8).

The Bankruptcy Court erred in reaching its conclusion, because the

applicable provisions of the UCC require only that the *act of filing* a termination

statement – and not the legal consequences that flow from that act of filing – be

authorized by a secured party in order for the filing to be effective. Indeed, even

standing alone, the Bankruptcy Court's finding that JPMorgan had "arguably

consented to the filing" of the 2008 Termination Statement demonstrates that the

Bankruptcy Court should not have granted summary judgment in JPMorgan's

favor. (SPA8). As explained in detail herein, the only relevant inquiry is whether

JPMorgan manifested its assent to the filing of the 2008 Termination Statement. If

the "arguably" that modifies "consented" in the Bankruptcy Court's decision is a

finding based on disputed facts, then (at the very least) JPMorgan's summary

judgment motion should have been denied. As explained below, however, the

undisputed facts establish that JPMorgan authorized the filing of the 2008

Termination Statement. Thus, not only did the Bankruptcy Court err by granting

5

summary judgment for JPMorgan, it should have entered summary judgment in favor of the Trust.

In reaching its conclusion, the Bankruptcy Court disregarded well-established case law holding that secured creditors are bound by the effects of properly filed (and therefore authorized) UCC termination statements, even when those UCC termination statements are erroneous. According to the Bankruptcy Court's flawed analysis, this case law is no longer applicable, now that secured creditors are no longer required to sign UCC termination statements. Instead, according to the Bankruptcy Court, secured creditors are not bound by their agents' filings unless the secured creditors intend the consequences that flow from that act of filing. There simply is no basis in the text of the UCC or the case law upon which to conclude that elimination of the signature requirement for ministerial reasons was in any way intended to upend the entrenched legal principle that secured creditors are bound by the effects of properly filed UCC termination statements, even when those termination statements are erroneous. If upheld on appeal, the Bankruptcy Court's decision threatens to entangle the UCC's public notice system, which depends on the reliability of public filings, in bottomless inquiries into the intentions that lie behind those filings.

In sum, because the secured lender (JPMorgan) authorized Mayer Brown to file the termination statement at issue, and Mayer Brown reasonably believed it

6

had been authorized by JPMorgan to perform that act, the Bankruptcy Court should have ruled that the filing was legally effective, even if the consequences of that filing were not intended by anyone.

## ISSUES PRESENTED

1.      Whether the filing of the 2008 Termination Statement was authorized by JPMorgan.

2.      Whether the Bankruptcy Court erred in holding that the UCC requires a secured lender to intend the legal consequences of filing a termination statement, when, under Article 9 of the UCC, all that is required is that the secured party of record authorize the act of filing the termination statement.

## STATEMENT OF THE CASE

On June 1, 2009 (the "Petition Date"), GM and certain of its subsidiaries (collectively, the "Debtors") filed for bankruptcy protection. (SPA23). Thereafter, on June 30, 2009, GM repaid a secured loan of approximately $1.5 billion made to it by a syndicate of more than 400 lenders that included JPMorgan as administrative agent and a lender (the "Term Loan"). (SPA23).[2] GM repaid the Term Loan to the Term Loan lenders out of the proceeds of the $33 billion debtor-in-possession credit facility financing advanced to GM by the United States Department of the Treasury. (SPA23).

The Term Loan lenders were repaid in full at the outset of the GM bankruptcy case, on the premise that their interest in the collateral securing the Term Loan was properly perfected as of the Petition Date. (A978). In the absence of a properly perfected security interest, there was no basis to pay the Term Loan lenders in full or ahead of other creditors of GM. (SPA23 n.54). For this reason, the Bankruptcy Court's order that conditionally approved GM's repayment of the Term Loan expressly preserved the right of the Trust's predecessor, the Committee, to investigate and challenge the purported perfection of the security interest related to the Term Loan. (A998-99).

---

[2] As administrative agent on the Term Loan, JPMorgan was the secured party of record in connection with that loan.

9

Following its investigation, the Committee concluded that the Term Loan should not have been repaid because, as of the Petition Date, the Term Loan lenders did not have a perfected security interest in the collateral securing the Term Loan. The Committee concluded that the Term Loan lenders' security interest had become unperfected due to the filing of a UCC-3 termination statement relating to the Term Loan collateral back in October of 2008 (the "2008 Termination Statement").

Accordingly, on July 31, 2009, the Committee filed a complaint against the Term Loan lenders (collectively, "Defendants" or "Term Loan Lenders") that, *inter alia*, challenged the perfection of the Defendants' security interest. (A82-145). As alleged in the Committee's complaint, if the Committee were to prevail in demonstrating that the Defendants' security interest was not perfected as of the Petition Date, then the unperfected security interest of the Term Loan Lenders would be trumped, pursuant to 11 U.S.C. § 544(a), by the statutory lien of the debtor-in-possession (GM) that arose upon the filing of its bankruptcy petition. (A133). As a consequence, the transfers to the Defendants could be avoided and the amounts repaid to them recovered for the benefit of GM's unsecured creditors. (A133-35).[3]

---

[3] In the event that the Trust prevails and the amounts repaid to the Defendants are recovered, the Defendants will be entitled to an unsecured claim in an amount equal to that recovered from them, which will be treated the same as any other

On July 1, 2010, the Committee moved for partial summary judgment (A295-97; Adv. Pro. Dkt. No. 24),[4] and JPMorgan cross-moved for summary judgment. (A1009-11; Adv. Pro. Dkt. No. 28). The parties filed their respective oppositions on August 5, 2010 (Adv. Pro. Dkt. Nos. 45, 48) and replies on August 26, 2010. (Adv. Pro. Dkt. Nos. 55, 56). In its summary judgment motion, the Committee contended that the 2008 Termination Statement was legally effective, thereby rendering the Defendants' security interest unperfected. In its cross-motion, while conceding that the 2008 Termination Statement had, in fact, been filed, JPMorgan argued that the filing had no legal effect. These were the only issues presented by the two motions. The Bankruptcy Court heard oral argument on the motions on December 3, 2010. (A3328-97).

On March 1, 2013, the Bankruptcy Court rendered its Decision on Cross-Motions for Summary Judgment (the "Decision") (SPA1-78) and entered the Order on Cross Motions for Summary Judgment (SPA79) and the Judgment (SPA80-81). In its Decision, the Bankruptcy Court denied the Committee's motion for partial summary judgment, ruling that the filing of the 2008 Termination Statement had no legal effect, and correspondingly granted JPMorgan's cross-motion for

---

general unsecured claim under GM's chapter 11 plan, as amended and modified (the "Plan").

[4] "Adv. Pro. Dkt. No." refers to those documents filed with the Bankruptcy Court in the underlying adversary proceeding, which is designated as adversary proceeding number 09-00504-reg (Bankr. S.D.N.Y.).

summary judgment. (SPA76). On that same day, the Bankruptcy Court entered the Order, Pursuant to 28 U.S.C. § 158(d), and Fed. R. Bankr. P. 8001(f)(4), Certifying Judgment for Direct Appeal to Second Circuit. (A3561-62).

On March 7, 2013, the Trust, as successor to the Committee,[5] timely filed a notice of appeal from the Judgment. (A3563-64). On April 5, 2013, the Trust timely filed a petition for permission for direct appeal. (A3565-757). On June 5, 2013, this Court entered an order granting the petition. (A3780).

---

[5] On March 29, 2011, the Bankruptcy Court confirmed the Plan. In connection with the Plan, the Trust was established to pursue this action as successor to the Committee on behalf of GM's unsecured creditors. (SPA3 n.1).

## STATEMENT OF FACTS

### A.   The DIP Order Is Entered And The Term Loan Lenders Are Repaid

GM filed its chapter 11 bankruptcy case on June 1, 2009.  (SPA23).  On June 25, 2009, the Bankruptcy Court entered the *Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties* (the "DIP Order").  (SPA23).  The DIP Order conditionally approved GM's repayment of amounts outstanding under certain of its prepetition secured loan facilities, including the approximately $1.5 billion that was outstanding under the Term Loan agreement dated as of November 29, 2006 (the "Term Loan Agreement") among GM, Saturn Corporation, JPMorgan, as administrative agent and the Term Loan Lenders.  (SPA23).  Thereafter, GM repaid the Term Loan Lenders.  (SPA23).

Importantly, the DIP Order's approval of repayment to the Term Loan Lenders was conditioned upon, and subject to, the Committee's right to investigate and challenge the purported perfection of the Term Loan Lenders' security interest in and against the Term Loan collateral.  (A998-99).  The reservation of the

13

Committee's rights was necessary because, as the Committee discovered just days

before entry of the DIP Order, a UCC-3 termination statement relating to the Term

Loan had been filed in 2008 (*i.e.*, the 2008 Termination Statement).  Accordingly,

paragraph 19(d) of the DIP Order authorized the Committee to bring an action to

challenge the perfection of the Term Loan Lenders' liens by no later than July 31,

2009.  (A998-99).

**B.     JPMorgan's Counsel Prepares The Robert
        Gordon Affidavit To Dissuade The Committee From
        Challenging The Term Loan Lenders' Security Interest**

On June 19, 2009, a few days prior to entry of the DIP Order, Morgan,

Lewis & Bockius LLP ("Morgan Lewis"), then counsel to JPMorgan, informed

counsel for the Committee, the Debtors and the United States Department of the

Treasury, that on October 30, 2008, "an unauthorized UCC-3 termination

statement was filed by Mayer Brown . . . with respect to the Delaware UCC-1

financing statement relating to the Term Loan Collateral."  (A2818).  Morgan

Lewis provided an affidavit executed by Robert E. Gordon ("Gordon"), a real

estate partner with Mayer Brown that, according to Morgan Lewis, "sets forth the

circumstances under which the termination statement was filed, and makes clear

that such action was unauthorized."  (A2818).  Morgan Lewis hoped that the

affidavit would "clarif[y] the situation and remove[] any doubt that the termination

statement was ineffective."  (A2818).  As described in the affidavit, Mayer Brown

14

represented GM in 2008 while GM and JPMorgan were closing a transaction that was unrelated to the Term Loan when, supposedly "[u]nbeknownst" to Gordon, a Mayer Brown paralegal caused the 2008 Termination Statement to be filed. (A2819-21).

## C. The Committee Discovers The Circumstances Surrounding The Filing Of The 2008 Termination Statement

On July 31, 2009, approximately one month after entry of the DIP Order and before the deadline set by the Bankruptcy Court therein, the Committee commenced the underlying action against JPMorgan seeking a determination that the filing of the 2008 Termination Statement terminated the UCC-1 financing statement related to the Term Loan and thereby caused the Term Loan Lenders' security interest to be unperfected as of the Petition Date. (SPA3). Through the discovery process in the underlying action, the Committee learned the facts surrounding the filing of the 2008 Termination Statement. As explained below, it was in connection with work on the payoff of a synthetic lease transaction in 2008 that Mayer Brown filed, with JPMorgan's knowledge and assent, the 2008 Termination Statement related to the Term Loan.

### 1. The Term Loan

The Term Loan was originated in November of 2006, when the Term Loan Lenders advanced $1.5 billion in loan proceeds to certain of the Debtors secured by a security interest in various assets of the Debtors (the "Term Loan Collateral").

15

(SPA9-10).  The Term Loan Lenders perfected their security interest by filing UCC-1 financing statements in connection with the Term Loan Collateral, with the main financing statement having been filed on November 30, 2006 with the Delaware Secretary of State (UCC-1 financing statement, filing # 64168084) (the "2006 Financing Statement").  (SPA10).  The 2006 Financing Statement listed JPMorgan, in its capacity as administrative agent, as the secured party of record. (A139).  Richard W. Duker ("Duker"), the managing director at JPMorgan who was responsible for JPMorgan's credit relationship with GM, executed the Term Loan Agreement on behalf of JPMorgan.  (SPA10).

### 2.  The Synthetic Lease

In or about October of 2008, GM and JPMorgan were working together to close a transaction for the payoff by GM of a 2001 "synthetic lease" financing arrangement (the "Synthetic Lease Payoff").  (SPA10-12).  The 2001 synthetic lease financing transaction provided GM with up to approximately $300 million in financing for the acquisition of, and construction on, several parcels of real property.  (SPA8).  JPMorgan was the administrative agent and one of the backup facility banks under the 2001 synthetic lease transaction.  (SPA9).  In connection with the 2001 synthetic lease financing, JPMorgan was represented by Simpson Thacher & Bartlett LLP ("Simpson Thacher"), and GM was represented by Mayer Brown.  (SPA9).

16

The 2001 synthetic lease financing was documented by, among other things, a participation agreement dated as of October 31, 2001 (the "Participation Agreement"). (SPA8). Duker, the managing director at JPMorgan responsible for JPMorgan's credit relationship with GM and the person who had executed the Term Loan Agreement on behalf of JPMorgan in 2006, also executed the Participation Agreement and amendment thereto in connection with the 2001 synthetic lease financing transaction. (A1151, A1785).

GM's obligation to repay the amounts advanced in the synthetic lease financing transaction was secured by liens on various parcels of real property associated with the 2001 synthetic lease transaction (the "Real Properties"). (SPA9). In connection with that 2001 transaction, UCC-1 financing statements were filed in various counties where the Real Properties were located, and UCC-1 financing statements were also filed with the Delaware Secretary of State. (SPA9).

Seven years later, in connection with the Synthetic Lease Payoff in 2008, JPMorgan was represented by Mardi Merjian ("Merjian") of Simpson Thacher. (SPA16). GM, as lessee, was represented by a team at Mayer Brown, supervised by Gordon. (SPA10).

17

**D.    The Synthetic Lease Is Paid Off And
        The 2008 Termination Statement Is Filed**

**1.    The 2008 Termination Statement Is Included On A
        Closing Checklist Sent To Simpson Thacher And JPMorgan**

On October 1, 2008, Gordon of Mayer Brown asked Ryan Green ("Green"),
an associate working under his direction, to put together a checklist for the
Synthetic Lease Payoff.  (SPA11).  Green, together with Mayer Brown paralegals,
prepared a closing checklist that was reviewed by Gordon.  (SPA14-15; A688,
A2620-21).  The closing checklist contained a heading titled "General
Documentation," below which was a subheading titled "Termination of UCCs."
(SPA15).

In order to determine the financing statements for which termination
statements should be prepared and identified on the closing checklist, Green
directed Michael Perlowski ("Perlowski"), a Mayer Brown paralegal, to perform a
UCC search.  (A2607-08).  After the UCC search was completed, Green,
Perlowski and Stewart Gonshorek ("Gonshorek"), another Mayer Brown paralegal,
reviewed and discussed the results of the search, and they all agreed on which
UCC-1 financing statements required termination statements and should therefore
be identified in the closing checklist.  (A2648).

18

Accordingly, the closing checklist listed, under the subheading "Termination of UCCs," three initial UCC-1 financing statements. (SPA15).[6] The first two were identified as "Blanket-type financing statements as to real Property and related collateral located in Marion County, Indiana (file number 2092532 5, file date 4/12/02 and file number 2092526 7, file date 4/12/02)." (SPA15). The third financing statement listed was the 2006 Financing Statement, identified as "financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06)." (SPA15).

Significantly, prior to closing on the Synthetic Lease Payoff, Green and Gonshorek specifically discussed whether the facilities identified on the schedule to the 2006 Financing Statement related to the synthetic lease financing, and concluded that they did. (A2642). Thus, in connection with the Synthetic Lease Payoff, Mayer Brown (and all other parties involved) believed, incorrectly, that the 2006 Financing Statement related to the 2001 synthetic lease financing. (A2642).

Each draft of the closing checklist identified the 2006 Financing Statement by file number (64168084), file date (November 30, 2006) and a description of the corresponding collateral (equipment, fixtures and related collateral located at certain U.S. manufacturing facilities). (SPA16). On October 15, 2008, Green sent

---

[6] Other UCC-1 financing statements were identified elsewhere on the closing checklist.

his client contact at GM a draft of the checklist, which listed the 2006 Financing

Statement by file number, file date and collateral description, as a UCC-1

financing statement for which a termination statement would be prepared.

(SPA16; A2859, A2865).  On that same date, Duker of JPMorgan received the

draft checklist from GM.  (A2868).  The draft checklist received by Duker also

listed the 2006 Financing Statement by file number, file date and collateral

description, identifying the 2006 Financing Statement as a financing statement for

which a termination statement would be prepared.  (SPA16; A2868, A2875).

Also on October 15, 2008, Green sent Merjian of Simpson Thacher the draft

checklist, which also identified the 2006 Financing Statement, by file number, file

date and collateral description, as a financing statement for which a termination

statement would be prepared.  (SPA16; A2878, A2882).  According to Green, he

sent the checklist to Merjian to be certain that "we were on the same page about

what needed to be done for closing" the Synthetic Lease Payoff and so that

JPMorgan's counsel "was aware of which documents were involved with the

closing from our perspective."  (A2623, A2627).

Later that same day, Duker again received a draft of the checklist, this time

from Merjian.  (SPA16; A3020).  Merjian sent the checklist to Duker "to keep him

in the loop."  (A2683).  As with all prior drafts of the checklist, it listed the 2006

Financing Statement – by file number, file date and collateral description – as a

financing statement for which a termination statement would be prepared.
(SPA16; A3020, A3026).

###    2.    The Draft 2008 Termination Statement
Is Sent To Simpson Thacher And JPMorgan

On October 15, 2008, Green also sent a draft of the 2008 Termination
Statement, along with other "drafts of the closing documents," to Merjian at
Simpson Thacher, and to his supervisor Gordon at Mayer Brown.  (SPA18; A2885,
A2907).[7]  It was Green's understanding that he "should circulate drafts of the
documents to . . . Merjian to review."  (A2629-30).  On that same date, Merjian
sent an identical draft set of the closing documents, including the draft 2008
Termination Statement, to Duker at JPMorgan.  (A3029, A3052).

The first line of the draft termination statement provided to JPMorgan and
its counsel Simpson Thacher, like the final, filed version, reads: "INITIAL
FINANCING STATEMENT FILE # 6416808 4 on 11.30.06."  (SPA17; *compare*
A2907, A3052 *with* SPA78).  Thus, on its face, the draft termination statement
identified the 2006 Financing Statement relating to the Term Loan, by file number
and file date, and corresponded to the description of the 2006 Financing Statement
included in the closing checklist.  On the second line of the draft, like the final,
filed version, a box was checked next to entry number 2, which reads as follows:

---

[7] Gonshorek prepared the 2008 Termination Statement, and the draft of that
document was reviewed by Green.  (A2628).

21

"TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement."  (*Compare* A2907, A3052 *with* SPA78).  The ninth line requests the "NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT" and lists "JPMORGAN CHASE BANK, AS ADMINISTRATIVE AGENT."  (SPA17; *compare* A2907, A3052 *with* SPA78).

A couple of days later, on October 17, 2008, Merjian replied to Green's email transmitting the draft termination statement and other closing documents.  (SPA18; A921).  Merjian wrote, "Ryan Nice job on the documents."  (SPA18; A921).  Gordon was copied on this email.  (A921).  Green understood Merjian's comment to encompass the draft documents Green had circulated to Merjian on October 15, 2008.  (SPA42; A2628-29).  Green also understood that Merjian had reviewed and approved these documents.  (A2629-30).

### 3.  Simpson Thacher Executes An Escrow Letter Authorizing The Release Of The 2008 Termination Statement To Mayer Brown

On October 24, 2008, Simpson Thacher's Merjian received a draft escrow letter from Green at Mayer Brown that was prepared for signature by, among others, counsel for GM, counsel for JPMorgan, and LandAmerica, the title company that issued title insurance for the Synthetic Lease Payoff.  (SPA18-19; A924-32).  The first page of the escrow letter provides, "Termination of UCC Financing Statements (File Number[] . . . and 6416808 4)."  (SPA20-21; A925).

22

Thus, the escrow letter again identified the 2006 Financing Statement as a financing statement for which a UCC-3 termination statement would be filed by including the identical file number that was listed in every draft of the closing checklist and in the draft 2008 Termination Statement provided to JPMorgan and its counsel.

In his transmittal email, Green asked Merjian if he had any comments to the draft escrow letter.  (SPA21; A934).  Merjian replied that "it was fine."  (SPA21; A934).  The escrow letter was thereafter signed by, Green, as attorney for GM, and Merjian, as attorney for JPMorgan, among others.  (SPA19).  Before signing, Merjian reviewed the escrow letter and understood that its purpose was to have the documents "placed with one party so that they could be released at the appropriate time to the appropriate parties."  (A2687).  In particular, Merjian understood that the termination statements listed were documents that would be released to Mayer Brown upon the closing of the Synthetic Lease Payoff.  (A2687).

On October 30, 2008, the Synthetic Lease Payoff closed, and Green instructed Gonshorek, one of the Mayer Brown paralegals who was working with him on the transaction, to file all of the Delaware UCC termination statements that were released to Mayer Brown, including the 2008 Termination Statement. (SPA22; A2653-54).  Later that day, consistent with the escrow letter, the 2008 Termination Statement was filed in the same exact form as the draft previously

23

circulated to JPMorgan's Duker and Simpson Thacher's Merjian. (A2885, A2907, A3029, A3052; *compare* A2907, A3052 *with* SPA78).

**E.    After The Petition Date, JPMorgan's Counsel
Raises Questions About The 2008 Termination Statement**

Approximately two weeks after GM filed its chapter 11 bankruptcy case on June 1, 2009, Morgan Lewis, then counsel to JPMorgan, realized that a UCC-3 termination statement relating to the Term Loan had been filed. (SPA23). Richard Toder at Morgan Lewis called Mayer Brown to ask why Mayer Brown had filed "a particular UCC termination in October of 2008" (*i.e.*, the 2008 Termination Statement). (A3013). In response to this query, Gordon called his associate Green, indicated that Morgan Lewis had expressed concern about the 2008 Termination Statement, and asked Green to look into the matter further. (A2634).

Thereafter, Green met with Gordon to "let him know that the UCC causing the concern was referenced on the checklist and in the escrow instructions." (A2634). Green showed Gordon the escrow instructions and the checklist so that Gordon could see that the termination statement was "within the universe of documents involved in the" Synthetic Lease Payoff. (A2635). When Gordon asked Green whether Merjian was made aware that the 2008 Termination Statement would be filed, Green explained that the "underlying financing statement was referenced on the checklist" that Green had sent to Merjian. (A2633).

24

Notwithstanding the fact that the 2008 Termination Statement "was referenced on the checklist and in the escrow instructions" and was "within the universe of documents involved in the" Synthetic Lease Payoff, in response to the concerns raised by Morgan Lewis on behalf of JPMorgan, Mayer Brown, as former counsel to GM, proposed to have Gordon execute an affidavit "in order to assist JPMorgan." (A2634-35, A2668). Morgan Lewis, on behalf of JPMorgan, prepared the initial draft of the affidavit, and sent it to Mayer Brown for review, explaining that JPMorgan was "very eager to be in a position for [the affidavit] to be executed . . ." (A962).

The initial draft of the affidavit prepared by Morgan Lewis stated that the Mayer Brown paralegal Gonshorek "unfortunately terminated [the 2006 Financing Statement] without [Gordon's] direction and without authority." (A964). Gordon, however, deleted that statement from the final affidavit. (A2670, A2818-21). The initial draft of the affidavit prepared by Morgan Lewis also stated that "*Mayer Brown* was not authorized to terminate any financing statement related to the Term Loan Agreement." (A965 (emphasis added)). But the final version of the affidavit, which is the version that Morgan Lewis disclosed to the Committee just days before the Bankruptcy Court entered the DIP Order, instead states that "*GM* was not authorized *by the Termination Agreement* to terminate any financing

statement related to the Term Loan Agreement." (*Compare* A2821 (emphasis added) *with* A964-65).

**F.    The Bankruptcy Court's Decision**

Ultimately, the Bankruptcy Court entered its Decision on the Committee's and JPMorgan's cross-motions for summary judgment. (SPA1-78). In its Decision, the Bankruptcy Court found that there was no dispute that "personnel from Simpson Thacher and JPMorgan received and reviewed the . . . Closing Checklist, and voiced no objection to it." (SPA39). The Bankruptcy Court also found that, with regard to the 2008 Termination Statement, among other documents, JPMorgan's counsel had expressly stated, "Nice job on the documents." (SPA40). As noted in the Decision, the draft (and final) 2008 Termination Statement stated that it was authorized by JPMorgan, as the secured party of record. (SPA17). Based on the above, the Bankruptcy Court noted that JPMorgan had "arguably consented to the filing" of the 2008 Termination Statement. (SPA8).

Notwithstanding the above findings, however, the Bankruptcy Court concluded that the filing was not authorized because the consequences of that consented-to UCC filing were not intended by JPMorgan or GM. (SPA7). As stated by the Bankruptcy Court, "neither the borrower nor the lenders on the Synthetic Lease financing, nor the borrower nor the Lenders on the Term Loan,

26

intended to affect the Term Loan in any way." (SPA5). According to the Bankruptcy Court, "[w]hen an agent acts on behalf of a secured lender principal to terminate an initial financing statement with respect to a financing," in order for the termination to have been authorized by the secured lender, the agent must believe that the secured lender "intended for the agent to terminate the initial financing statement for that particular financing." (SPA7). The Bankruptcy Court held that "here, the lack of the requisite belief on the part of GM that it was authorized to terminate the" 2006 Financing Statement "is ultimately conclusive." (SPA7). On that basis, the Bankruptcy Court granted summary judgment in favor of JPMorgan, ruling that the 2008 Termination Statement had no legal effect. (SPA8).

27

# SUMMARY OF THE ARGUMENT

Resolution of this appeal turns on the following question: did JPMorgan authorize the filing of the 2008 Termination Statement? The answer to this question is yes. The undisputed facts, which the Bankruptcy Court discussed and acknowledged, and then disregarded, in its Decision, establish that JPMorgan did, in fact, authorize Mayer Brown to file the 2008 Termination Statement. The Bankruptcy Court disregarded JPMorgan's consistent manifestations of assent to the filing of the 2008 Termination Statement by Mayer Brown. Even if JPMorgan had not given its express written approval (which it did), by manifesting its assent, JPMorgan authorized Mayer Brown to file the 2008 Termination Statement. Accordingly, the 2008 Termination Statement was legally effective and caused the Term Loan Lenders' security interest to become unperfected.

The Bankruptcy Court reached the opposite conclusion, however, because it focused on the wrong question. Instead of deciding whether the act of filing the erroneous termination statement was authorized, the Bankruptcy Court focused, in error, on the question of whether JPMorgan intended the legal consequences that followed from the filing of the erroneous termination statement, and whether Mayer Brown reasonably believed that JPMorgan intended such legal consequences. The Bankruptcy Court's analysis is contrary to the UCC, and the

28

applicable principles of agency law, which require only that the acts of an agent, and not the legal consequences of those acts, be authorized by the principal.

As the Bankruptcy Court correctly recognized in the Decision, the granting of actual authority requires that the agent reasonably believe that its principal wishes it to so act. Here, the record leaves no doubt that Mayer Brown reasonably believed, based on JPMorgan's manifestations of assent, that it was authorized to cause the filing of the 2008 Termination Statement. In particular, JPMorgan knew in advance that the 2008 Termination Statement would be filed, and its counsel approved a draft of the 2008 Termination Statement before it was filed. Further, JPMorgan's counsel signed an escrow letter and approved drafts of the closing checklist that specifically identified the 2006 Financing Statement as a UCC-1 financing statement for which a termination statement would be filed.

In its Decision, the Bankruptcy Court overlooked key testimony from Ryan Green, the Mayer Brown attorney who testified to his understanding that Mayer Brown was authorized to file the 2008 Termination Statement. The Bankruptcy Court also misconstrued the Gordon affidavit (and failed to consider the revisions that resulted in the final version of that affidavit), which actually demonstrate that Mayer Brown believed it was authorized to file the 2008 Termination Statement. The Bankruptcy Court also erred in giving weight to the affidavit of Debra Homic Hoge ("Hoge"), a GM employee who played no role at all in the Synthetic Lease

29

Payoff, because that affidavit does not even address the key issue of whether

Mayer Brown, based upon JPMorgan's manifestations of assent, reasonably

believed at the time that it was authorized to file the 2008 Termination Statement.

Ignoring the facts evidencing Mayer Brown's authority to perform the act of

filing the 2008 Termination Statement on behalf of JPMorgan, the Bankruptcy

Court instead focused, in error, on the legal consequences of that act. Thus, the

Bankruptcy Court erroneously concluded that because JPMorgan did not intend to

terminate the 2006 Financing Statement, and because Mayer Brown did not believe

it was authorized to cause the termination of the 2006 Financing Statement, then

the filing of the 2008 Termination Statement could not be legally effective. But

the fact that, at the time of its filing, the parties did not think about the connection

between the 2008 Termination Statement and the 2006 Financing Statement does

not mean that Mayer Brown's act of filing that document was not authorized.

Rather, it means that JPMorgan authorized Mayer Brown to file an erroneous

termination statement, making this a case about mistake – not lack of

authorization.

The Bankruptcy Court also erred by rejecting as outdated an entire line of

key UCC cases, which stand for the proposition that termination statements, even

if erroneous, are nonetheless legally effective. Contrary to the Bankruptcy Court's

analysis and holding, the 2001 revisions to Article 9 of the UCC, allowing

30

authorized persons to file termination statements and other financing statements on behalf of secured parties, did not abrogate the well-established case law upholding the effectiveness of properly filed termination statements, even those containing mistakes.  The Bankruptcy Court's holding also conflicts with the UCC's public notice system and severely undermines the ability of potential creditors to rely on the public records maintained under the UCC system.

# ARGUMENT

## A.  Standard Of Review

This Court reviews a bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error.  *See Air Line Pilots Ass'n, Int'l v. Shugrue (In re Ionosphere Clubs, Inc.)*, 22 F.3d 403, 406 (2d Cir. 1994).  Additionally, a bankruptcy court's application of facts to draw conclusions of law is subject to *de novo* review.  This standard is equally applicable to mixed questions of law and fact.  *See FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir. 1994).  Similarly, a bankruptcy court's ruling on a motion for summary judgment is subject to *de novo* review by this Court.  *See Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs.)*, 153 F.3d 61, 67 (2d Cir. 1998).

## B.  The Bankruptcy Court Erred In Concluding That The 2008 Termination Statement Was Not Legally Effective

The Bankruptcy Court concluded that the 2008 Termination Statement was not legally effective because JPMorgan did not intend the legal consequences of the filing of that erroneous termination statement:  termination of the 2006 Financing Statement.  But the relevant inquiry in this case is not whether JPMorgan authorized the legal consequences that flowed from the filing of the

32

2008 Termination Statement.  As the applicable provisions of the UCC make clear, the question in this case is whether JPMorgan authorized Mayer Brown to cause *the filing* of the 2008 Termination Statement.  As further explained below, the undisputed facts, which the Bankruptcy Court discussed and acknowledged in its Decision, establish that JPMorgan authorized Mayer Brown to file the 2008 Termination Statement.  Because it was an authorized filing, the 2008 Termination Statement was legally effective to terminate the 2006 Financing Statement.

      1.      **The UCC Requires Only That A Secured Party Authorize The Act Of Filing A <u>Termination Statement, Not The Legal Consequences</u>**

As the Bankruptcy Court correctly recognized, there are three sections of the UCC that are relevant to the question of whether the filing of the 2008 Termination Statement was authorized by JPMorgan and therefore legally effective.  First, section 9-509(d)(1) of the UCC provides in relevant part that "[a] person may *file* [a termination statement] . . . only if: (1) the secured party of record authorizes *the filing*."  Del. Code Ann. tit. 6, § 9-509(d)(1) (emphasis added).  Next, section 9-510(a) provides in relevant part that "[a] filed record is effective only to the extent that *it was filed* by a person that may file it under Section 9-509."  Del. Code Ann. tit. 6, § 9-510(a) (emphasis added).  Finally, section 9-513(d) provides in relevant part that, upon the filing of a termination statement by a person entitled to do so,

33

"the financing statement to which the termination statement relates ceases to be effective." Del. Code Ann. tit. 6, § 9-513(d).

As these statutory provisions make clear, the relevant inquiry is whether the secured party authorized the *act* of filing a UCC-3 termination statement. *See* Del. Code Ann. tit. 6, § 9-509(d)(1). Simply stated, the UCC does not require, for the filing of a UCC-3 termination statement on behalf of a secured creditor to be legally effective, that the secured creditor authorize the legal consequences that occur as a result of the filing. Accordingly, the proper question in this case is whether JPMorgan authorized Mayer Brown to file the 2008 Termination Statement and not, as the Bankruptcy Court erroneously framed the issue, whether JPMorgan intended, or authorized Mayer Brown, to terminate the initial UCC-1 financing statement relating to the Term Loan.[8]

---

[8] The Bankruptcy Court repeats this error at least nine times in the Decision. *See, e.g.*, SPA36 ("JPMorgan did not grant actual authority to terminate the Main Term Loan UCC-1."); SPA37 ("[T]he Court finds no grant of authority to terminate the Main Term Loan UCC-1."); SPA39 ("[T]he Court cannot . . . find an authorization to terminate the Main Term Loan UCC-1."); SPA41 ("[A]ssuming *arguendo* that the draft UCC-3 could be deemed to be an authorization of something, it cannot be found to be an authorization to terminate the Main Term Loan UCC-1."); SPA43 (noting that the escrow letter "could not be regarded as an authorization to terminate the Main Term Loan UCC-1"); SPA44 ("termination of the Main Term Loan UCC-1 was not authorized"); SPA47 ("authority to terminate the Main Term Loan UCC-1 was not granted"); SPA48 ("JPMorgan did not give actual authority to GM to terminate the Main Term Loan UCC-1."); SPA61 ("There was no actual authority . . . to terminate the Main Term Loan UCC-1.").

34

### 2.  The Undisputed Facts Establish That JPMorgan Authorized The Filing Of The 2008 Termination Statement

The UCC does not define the term "authorizes."  Thus, to determine whether JPMorgan authorized Mayer Brown to file the 2008 Termination Statement, it is necessary to consider law outside of Article 9 of the UCC.  (SPA33 n.83) (recognizing that "whether a person has the requisite authority to file a record" under section 9-509 of the UCC is generally made by reference to applicable law other than Article 9 of the UCC) (quoting Official Comment 3 to UCC § 9-509).  In this case, the principles of agency law confirm that JPMorgan granted actual authority to Mayer Brown to file the 2008 Termination Statement.

As an initial matter, it is important to note that, like section 9-509 of the UCC, agency law focuses on the acts to be performed by an agent on behalf of a principal and not on the legal consequences of those acts.  "Actual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent *take action* on the principal's behalf."  Restatement (Third) of Agency § 3.01 (2006) (emphasis added).  Section 2.01 of the Restatement also provides:

> An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent *so to act*.

35

Restatement (Third) of Agency § 2.01 (2006) (emphasis added); *Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 457 B.R. 29, 47 (B.A.P. 9th Cir. 2011) (noting that the concept of "assent" is used instead of "consent" "to 'emphasize that unexpressed reservations or limitations harbored by the principal do not restrict the principal's expression of consent to the agent'") (quoting Restatement (Third) of Agency § 1.01 (2006) (cmt. d)). Accordingly, actual authority is created when the agent reasonably believes, based on the principal's "manifestations," that the principal wishes the agent to commit an act. A manifestation, in turn, is "conduct by a person, observable by others, that expresses meaning." Restatement (Third) of Agency § 1.03 (2006) (cmt. b). The Restatement further explains that the term "manifestations" goes beyond communication, and that the failure to respond or object may also be a manifestation:

> [Manifestation] is a broader concept than communication. . . . Expressive conduct is not limited to spoken or written words, although it often takes those forms. Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance.

*Id*; *see also In re Palmdale Hills Prop., LLC*, 457 B.R. at 48 ("Common-law agency and the Restatement allow agency to be manifested by conduct, silence, estoppel or ratification."). Furthermore, "the extent of the agent's actual authority

36

is interpreted in the light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir. 1968).

In this case, the undisputed facts establish that Mayer Brown reasonably believed, both objectively and subjectively, based on JPMorgan's manifestations of assent, that the act of filing the 2008 Termination Statement was authorized. JPMorgan's manifestations, which occurred in connection with the various communications that preceded the closing on the Synthetic Lease Payoff, demonstrate that JPMorgan and its counsel knew, before it was filed, that Mayer Brown intended to file the 2008 Termination Statement and, although all parties mistakenly believed that the document related to the synthetic lease transaction, JPMorgan consented to its filing. Specifically, JPMorgan's manifestations include the following:

### (a)    Closing Checklist

JPMorgan manifested its assent to the filing of the 2008 Termination Statement when JPMorgan and its counsel did not object to the various drafts of the closing checklist they received for review from Mayer Brown. Each draft of the closing checklist circulated by Mayer Brown specifically identified, under the "General Documentation" heading, "three UCC-1s that had been filed in Delaware

37

[and that] were listed for termination." (SPA15). One of those three UCC-1s was the 2006 Financing Statement, which was identified as a "financing statement as to equipment, fixtures and related collateral located at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06)." (SPA15).

As the Bankruptcy Court recognized, the November 30, 2006 file date "substantially corresponds to the November 29, 2006 date of the Term Loan Agreement, though no one involved recognized that at the time." (SPA16).[9] As the Bankruptcy Court further acknowledged, there is no dispute that "personnel from Simpson Thacher and JPMorgan received and reviewed the . . . Closing Checklist, and voiced no objection to it." (SPA39). JPMorgan's failure to object to, or for that matter even question, the identification of the 2006 Financing Statement as a UCC-1 "listed for termination" was a manifestation of JPMorgan's assent to Mayer Brown's filing of the 2008 Termination Statement. (SPA15). Even though the inclusion of the 2006 Financing Statement was a mistake, Mayer Brown's belief that JPMorgan authorized the filing of the termination statements for each of the UCC-1s listed in the closing checklist was, based on JPMorgan's manifestations of assent, reasonable.

---

[9] It bears noting that the two other UCC-1s identified in the closing checklist under the "General Documentation" heading included file dates (April 12, 2002) and descriptions of collateral (that included parcels of real property) that were significantly different from the date and collateral description for the 2006 Financing Statement. (SPA15).

### (b)    __Draft 2008 Termination Statement__

JPMorgan again manifested its assent to the filing of the 2008 Termination

Statement when, before the 2008 Termination Statement was filed, JPMorgan and

its counsel approved a draft of the 2008 Termination Statement that Mayer Brown

provided to them for review. The Bankruptcy Court found that both JPMorgan and

Simpson Thacher received a draft of the 2008 Termination Statement before it was

filed. (SPA40). The Bankruptcy Court also found that it "is undisputed that

JPMorgan knew in advance of GM's counsel's intent to file a UCC-3 which

showed the 'Initial Financing Statement File #' of a UCC-1 that in fact was the

initial financing statement on the Term Loan (and JPMorgan at least arguably

consented to the filing)." (SPA7-8). The Bankruptcy Court also recognized that

"when Simpson Thacher's Merjian stated, 'Nice job on the documents'" to Mayer

Brown's Green, the draft 2008 Termination Statement "was covered under that

remark." (SPA42).

Notwithstanding these findings, and apparently to bolster its conclusion that

authorization was lacking because JPMorgan did not intend to terminate a

financing statement related to the Term Loan and because Mayer Brown did not

reasonably believe that it was authorized to terminate a financing statement related

to the Term Loan, the Bankruptcy Court went to great lengths to excuse the parties

for failing to notice at the time that the 2008 Termination Statement was

39

mistakenly included among the Synthetic Lease Payoff closing documents. Specifically, the Bankruptcy Court rejected the Committee's contention that the 2008 Termination Statement indicated that the 2006 Financing Statement was being terminated, because the words "Term Loan" never appeared on the 2008 Termination Statement. (SPA41 n.101). According to the Bankruptcy Court, the 2008 Termination Statement "made no reference to the Term Loan other than as might be ascertained by looking at the number listed under 'Initial Financing Statement File #' and then following through on an inquiry to discern the file number's significance." (SPA41). The Bankruptcy Court went on to say that "[t]he Committee's argument rests on what might have been learned in the multi-step inquiry process if any of Simpson Thacher, JPMorgan, Mayer Brown or GM had engaged in one." (SPA41-42 n.101).

As an initial matter, in its criticism of the Committee's position, the Bankruptcy Court ignores the inclusion of the "11.30.06" file date listed next to the file number in the 2008 Termination Statement, which the Bankruptcy Court found to "substantially" correspond to the date of the Term Loan Agreement. (SPA16-17). What is more troubling, however, is that the Bankruptcy Court's analysis transforms JPMorgan's mistake (namely, failing to recognize that the 2008 Termination Statement was mistakenly included among the other closing documents) into a lack of authorization of Mayer Brown to file the 2008

40

Termination Statement.  But the parties' failure to recognize their mistake in designating the 2008 Termination Statement for filing is irrelevant to the determination of whether Mayer Brown was authorized by JPMorgan to file it.

The extent of Mayer Brown's actual authority must be interpreted in "light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware."  *Demarco*, 390 F.2d at 844.  When the entirety of the circumstances here are considered – Mayer Brown's delivery of draft transactional documents to JPMorgan for review in advance of closing, and JPMorgan's approval of those documents – it was entirely reasonable for Mayer Brown to believe that a "multi-step inquiry process" regarding those documents had been undertaken.  (SPA42 n.101).  As such, and in light of JPMorgan's manifestations of assent, Mayer Brown's belief that it was authorized to file the 2008 Termination Statement was certainly reasonable.

### (c)    Escrow Letter

JPMorgan again manifested its assent to the filing of the 2008 Termination Statement when JPMorgan and its counsel approved the draft escrow letter that Mayer Brown provided to them for review.  That escrow letter identified a UCC-3 termination statement relating to the 2006 Financing Statement as one of the documents to be delivered to the title company, which "was instructed to deliver it

41

(along with others) to GM's counsel, Mayer Brown." (SPA21). Green of Mayer Brown asked Merjian of Simpson Thacher if he had any comments to the draft escrow letter, to which "Merjian replied 'it was fine.'" (SPA21). Merjian then signed the letter. (SPA19).

The Bankruptcy Court erroneously concluded that the escrow letter "did not give Mayer Brown instructions or authority to do anything." (SPA43). The obvious purpose of releasing and forwarding the documents to Mayer Brown was to allow Mayer Brown to cause them to be filed, and it was by no means necessary for JPMorgan to say "you may file the 2008 Termination Statement" or to incant other "magic words" in order to manifest its assent. *See In re Palmdale Hills Prop., LLC*, 457 B.R. at 53-54 (holding that "a principal's authorization for the agent to act on its behalf in a debtor's bankruptcy case necessarily includes authorization to file a proof of claim" and requiring that a principal expressly tell its agent "and you may file a proof of claim on my behalf" would be unfairly prejudicial to those "who failed to utter the 'magic' words"). Indeed, JPMorgan has never objected to the filing of the other Delaware UCC termination statements that were listed in the escrow letter, all of which were released to Mayer Brown for filing. (A3015, A3018). JPMorgan authorized the filing of those other (correct) UCC termination statements in precisely the same manner that it authorized the filing of the (erroneous) 2008 Termination Statement. Thus, there is no doubt that,

42

like the correct UCC termination statements, the 2008 Termination Statement was also authorized for filing.

### (d)    <u>Termination Agreement</u>

The Bankruptcy Court afforded significant weight to the termination agreement and release of operative agreements dated October 30, 2008 (the "Termination Agreement"), deeming it the sole source of authority conveyed by JPMorgan with respect to the filing of UCC-3 termination statements.[10] The Bankruptcy Court's reliance on this document is misplaced. As an initial matter, the Bankruptcy Court's focus on the Termination Agreement, a document entered into between JPMorgan and GM, misses the mark because the relevant agency relationship at issue here is the one between JPMorgan and Mayer Brown. Ultimately, JPMorgan manifested to Mayer Brown its assent to Mayer Brown's filing of the 2008 Termination Statement.

More to the point, while the Termination Agreement expressly authorized GM to file termination statements for existing financing statements concerning the Real Properties that were related to the 2001 synthetic lease financing, that document does not contain a merger or integration clause, and there is no

---

[10] Pursuant to the Termination Agreement, JPMorgan and Auto Facilities Real Estate Trust 2001-1, as lessor, authorized GM "to file a termination of any existing Financing Statement relating to the Properties." (A2835). The Termination Agreement further provided that "capitalized terms not otherwise defined herein shall have the meanings set forth in Annex A to that certain Participation Agreement." (A2835).

43

indication in that document or elsewhere that the Termination Agreement was the sole source of authority for GM (or its counsel, Mayer Brown) to file UCC termination statements on behalf of JPMorgan. To the contrary, and as explained above, Mayer Brown was authorized by JPMorgan and its counsel to file the 2008 Termination Statement based upon JPMorgan's manifestations of assent, including its review of the closing checklist and the draft 2008 Termination Statement, its express email approval of those documents, and the escrow letter signed by JPMorgan's counsel. Mayer Brown reasonably believed, based on the foregoing manifestations, that it was authorized by JPMorgan to file the 2008 Termination Statement.

**C.  Mayer Brown Reasonably Believed
That JPMorgan Authorized The Filing Of
The 2008 Termination Statement At The Time**

The Bankruptcy Court's ruling rested on the determination that "no one on the GM side had any belief, reasonable or otherwise, that GM had been authorized to terminate JPMorgan's security interests with respect to the Term Loan." (SPA48). Again, the Bankruptcy Court is asking the wrong question. The issue is not whether *GM* reasonably believed it was authorized to terminate JPMorgan's security interest in the Term Loan. Rather, the issue is whether *Mayer Brown* reasonably believed that JPMorgan had assented to the *filing* of the 2008 Termination Statement. While it is true that no one realized at the time that the

44

2006 Financing Statement or the 2008 Termination Statement related to the Term Loan, the Bankruptcy Court's conclusion that, as a result of the misunderstanding, GM did not believe "that actions to terminate the [2006 Financing Statement] were authorized" is based on an erroneous application of the law and disregards key undisputed facts. (SPA8).

As explained above, in light of JPMorgan's multiple and consistent manifestations, Mayer Brown's belief that it was entitled to file the 2008 Termination Statement was entirely reasonable. Mayer Brown's belief regarding its authority to file the 2008 Termination Statement is further confirmed by the testimony of the Mayer Brown attorneys who were involved in the 2008 Synthetic Lease Payoff. It is telling that there is no evidence in the record that Mayer Brown has ever been threatened with legal action arising from its filing of the 2008 Termination Statement. (A2676). That is because Mayer Brown was not off on some frolic and detour, but rather was acting in a manner consistent with its reasonable understanding of JPMorgan's instructions.

### 1. The Bankruptcy Court Overlooked Key Testimony From Mayer Brown's Ryan Green

The Bankruptcy Court's conclusion that Mayer Brown did not believe it was authorized to file the 2008 Termination Statement is contradicted by the sworn and uncontroverted testimony of the individuals at Mayer Brown who worked on the Synthetic Lease Payoff. Ryan Green, the Mayer Brown associate involved in the

Synthetic Lease Payoff, testified that he circulated the closing checklist to JPMorgan's counsel to ensure "we were on the same page about what needed to be done for closing." (A2623). Green further testified that he sent the closing checklist to Merjian at Simpson Thacher so that he "was aware of which documents were involved with the closing from our perspective and so that he was updated as to the status of the drafts." (A2627).

Green also circulated document drafts, including a draft of the 2008 Termination Statement, to JPMorgan's "counsel to review." (A2627). Further, Green understood that the purpose of having "the various parties sign off on escrow instructions" was to confirm that the parties' representatives "were on the same page . . . about what would happen at closing." (A2630-31). Prior to the filing of the 2008 Termination Statement, Green and Gonshorek, one of the Mayer Brown paralegals who assisted with the Synthetic Lease Payoff transaction, specifically discussed whether the 2006 Financing Statement related to the 2001 synthetic lease financing. (A2642). Green testified that, at the time of closing, he "understood that the documents related to the synthetic lease" financing. (A2642).

The Bankruptcy Court fails to even mention Ryan Green's testimony in the Decision. As Green testified, when JPMorgan contacted Mayer Brown after GM filed its chapter 11 case in June of 2009 to inquire about the filing of the 2008 Termination Statement, Green told his supervisor, Gordon, that "the UCC causing

46

the concern was referenced on the checklist and in the escrow instructions" and was "within the universe of documents involved in the unwind." (A2634-35). Green's testimony therefore confirms that the closing checklist and escrow letter approved by JPMorgan and its counsel were manifestations that he and Mayer Brown subjectively understood at the time to authorize the filing of the 2008 Termination Statement. For the reasons explained above, JPMorgan's manifestations of assent at the time render Green's subjective understanding objectively reasonable.

### 2.   The Bankruptcy Court Misconstrued The Gordon Affidavit

The Bankruptcy Court also misconstrued the affidavit submitted by Robert Gordon, relying on it to support the proposition that Mayer Brown did not believe it was authorized to file the 2008 Termination Statement. (SPA22). As an initial matter, Gordon's affidavit speaks only to GM's authority, and says nothing about Mayer Brown's. Indeed, the only point the final version of the Gordon affidavit even mentions about Mayer Brown is that "Mayer Brown has never represented GM with respect to the Term Loan Agreement." (A2821).

More importantly, Gordon's affidavit does not even address the key issue: whether Mayer Brown believed it was authorized to *file* the 2008 Termination Statement. Instead, Gordon's affidavit speaks to the irrelevant issue of legal consequences in reciting that GM was not authorized "to terminate any financing

47

statement related to the Term Loan Agreement." (A2821). And, although an initial draft of Gordon's affidavit did address Mayer Brown's authority and stated that "Mayer Brown was not authorized to terminate any financing statement related to the Term Loan Agreement," Gordon revised this language before signing his affidavit. (A2668; *compare* A965 *with* A2821). The final version of Gordon's affidavit was changed to state that "*GM* was not authorized *by the Termination Agreement* to terminate any financing statement related to the Term Loan Agreement." (A2821 (emphasis added)). By clear implication, these revisions to Gordon's affidavit show that the professionals at Mayer Brown thought they were authorized to file the 2008 Termination Statement by circumstances other than the Termination Agreement. For all of the reasons explained above, Mayer Brown's belief was reasonable based on JPMorgan's manifestations of assent.

### 3.    The Hoge Affidavit Is Irrelevant

The Bankruptcy Court's reliance on the March 2010 affidavit submitted by GM's Hoge is also misplaced. As an initial matter, Hoge was not copied on any of the correspondence between JPMorgan and Mayer Brown that was transmitted in connection with the Synthetic Lease Payoff, and her affidavit fails to lay a foundation to demonstrate that she had any contemporaneous or personal knowledge regarding the events that took place in 2008.

48

Furthermore, Hoge's affidavit should be afforded no weight because, like the Gordon affidavit, it fails to address the key issue of whether Mayer Brown believed it was authorized to file the 2008 Termination Statement at the time of the filing. Hoge's affidavit speaks only to GM's authority, and GM's manifestations to Mayer Brown, while failing to address JPMorgan's manifestations of assent to Mayer Brown to the filing of the 2008 Termination Statement.

Thus, the statement by Hoge that "GM was not authorized by the . . . Termination Agreement, nor did . . . GM believe it had any authority, to terminate any UCC-1 financing statement related to the Term Loan" is irrelevant to whether Mayer Brown's act of filing the 2008 Termination Statement was authorized by JPMorgan. (A3129). Likewise, Hoge's statement that *GM* did not "provide Mayer Brown with any authority to file a termination statement" relating to the Term Loan is also irrelevant to the central issue of whether *JPMorgan* authorized Mayer Brown to file the 2008 Termination Statement. (A3129). Accordingly, the Bankruptcy Court's consideration of the Hoge affidavit, over the Trust's objection, was an error. (SPA35-36 n.93).

**D.      Secured Creditors Are Bound By Their
         Mistakes Under Revised Article 9 Of The UCC**

The Bankruptcy Court also erroneously concluded that an entire line of key UCC cases was irrelevant to its analysis. Specifically, the Bankruptcy Court dismissed out of hand a series of decisions that were rendered before the 2001

49

revisions to Article 9 of the UCC were adopted.  These cases recognize that UCC-3

termination statements, even if they contain a mistake, are nonetheless legally

effective.  This principle of law, that the effect of a termination statement on a

security interest is "dramatic and final," is unaltered by the 2001 revisions to

Article 9.  *Roswell Capital Partners LLC v. Alt. Constr. Techs.*, No. 08 Civ. 10647

(DLC), 2010 WL 3452378, at *7 (S.D.N.Y. Sept. 1, 2010), *aff'd*, 436 F. App'x 34

(2d Cir. 2011) (quoting *Peoples Bank of Ky., Inc. v. U.S. Bank, N.A. (In re S.J. Cox

Enters., Inc.)*, Bankr. Case No. 07-50705, Adv. Pro. Case No. 08-5066, 2009 WL

939573, at *5 (Bankr. E.D. Ky. Mar. 4, 2009) (quoting *Crestar Bank v. Neal (In re

Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d 1242, 1247 (4th Cir. 1992)).

     As the pre-2001 UCC cases make clear, a secured creditor can cause the

termination of its initial financing statement, even when it did not intend to do so.

*See generally In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987, 989 (Bankr.

M.D. Fla. 1992) ("even if the Termination Statement did not reflect the parties'

true intent, it would be materially misleading to a potential creditor relying on the

public records and therefore should not be set aside."); *Crestar Bank v. Neal (In re

Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d 1242, 1245-47 (4th Cir. 1992) (holding

that a bankruptcy trustee could avoid a lien under section 544(a) of the Bankruptcy

Code because the effect of a termination statement "on a secured interest is

dramatic and final," even though the box marked "termination" was checked in

50

error); *Koehring Co. v. Nolden (In re Pac. Trencher & Equip., Inc.*), 27 B.R. 167,

168 (B.A.P. 9th Cir. 1983), *aff'd*, 735 F.2d 362 (9th Cir. 1984) (holding that

"pursuant to clearly articulated authority," the creditor's "prior [UCC] filings lost

even marginal sufficiency upon the filing of a termination statement, albeit

erroneous, and that in turn effected a lapse in perfection"); *Rock Hill Nat'l Bank v.

York Chem. Indus., Inc. (In re York Chem. Indus., Inc.)*, 30 B.R. 583, 586 (Bankr.

D.S.C. 1983) (creditor's "lien was unperfected as to the debtor in possession"

because creditor had terminated its "financing statement – albeit unintentionally

and inadvertently.").

  For instance, in the *Kitchin* case, the Fourth Circuit considered whether a

creditor retained a perfected security interest after filing a termination statement

that contained a mistake. *In re Kitchin Equip. Co. of Va., Inc.*, 960 F.2d at 1244.

The secured creditor mistakenly "checked the box marked TERMINATION" and

inserted "the file number of the original financing statement" thus "indicating in

accordance with the language of the form that this was a termination statement."

*Id*. at 1246. The Fourth Circuit reversed the district court and the bankruptcy

court, holding that, even though the box was checked in error, the secured creditor

was bound by the error and the termination statement was effective. *Id*.

  Similarly, in *York*, one of the creditor's employees, "apparently through

inadvertence," requested the termination of an active financing statement. *In re*

51

*York Chem. Indus., Inc.*, 30 B.R. at 585. None of the parties intended that the financing statement be terminated. *Id*. Nevertheless, the court held that the creditor was responsible for having unintentionally and inadvertently terminated its financing statement. *Id*. at 586.

The effect of the filing of a termination statement containing a mistake was also addressed in *Pacific Trencher*. In that case, a creditor, intending to file a partial release, filed a termination statement in error. *In re Pac. Trencher & Equip., Inc.*, 27 B.R. at 168. The Bankruptcy Appellate Panel of the Ninth Circuit affirmed the trial court's grant of summary judgment in favor of the trustee in bankruptcy, which held that the creditor filing the erroneous termination statement had no perfected security interest under California's version of the UCC. *Id*. As the court explained, the filing of the erroneous termination statement "resulted in the expunction of [the creditor's financing] statement . . . and [the creditor's] perfection must be regarded as having lapsed." *Id*. at 169.

In accordance with the above cases, the court in *Silvernail* also ruled that a creditor's security interest became unperfected upon the filing of an erroneous termination statement. *In re Silvernail Mirror & Glass, Inc.,* 142 B.R. at 989. The court held that the language of the termination statement "unambiguously terminated" the creditor's security interest and was not subject to any other interpretation. *Id*. at 989-90.

In *Hampton*, the court sustained a trustee-in-bankruptcy's objection and enforced a termination statement filed with a mistake. *In re Hampton*, No. 99-60376, 2001 WL 1860362, at *3 (Bankr. M.D. Ga. Jan. 2, 2001). The court found that, as of the petition date, "no valid financing statement existed," and therefore the creditor's security interest was unperfected. *Id*. at *1. The court noted that "anyone who conducted a search of the public records . . . would have concluded that no security interest existed." *Id.* at *2. Despite having signed the termination statement, the creditor asserted that the termination "was done in error and executed without [its] authority." *Id*. at *1. Nonetheless, the court found that "sufficient authority existed to execute the termination statement," and therefore the termination statement was effective. *Id*. at *3.

The rule that properly filed termination statements that contain mistakes are nonetheless effective has not been abrogated by the 2001 amendments to the UCC, and is therefore applicable here.[11] In this case, the 2008 Termination Statement stated unambiguously that it related to the 2006 Financing Statement. JPMorgan and its counsel reviewed and approved a draft of the 2008 Termination Statement

---

[11] If JPMorgan, rather than its agent, Mayer Brown, had itself filed the erroneous 2008 Termination Statement, there can be no doubt whatsoever that such termination statement would have been effective. There is no basis in law or in equity for there to be a different result where JPMorgan approved the erroneous 2008 Termination Statement for filing by Mayer Brown.

before it was filed.  As the foregoing cases make clear, as a matter of law, even if it contained a mistake, the 2008 Termination Statement was legally effective.

Moreover, decisions in cases decided *after* the 2001 amendments further confirm that termination statements filed by authorized persons on behalf of secured parties, even if they contain mistakes, are nonetheless legally effective. *See, e.g.*, *Roswell*, 2010 WL 3452378, at *7 (relying on the pre-2001 UCC cases in holding that "'[t]he termination of a financing statement, *even if mistaken*, releases the secured creditor's lien against the debtor's property'") (emphasis in original) (citations omitted); *Ward v. Bank of Granite & Hickory Printing Solutions, LLC (In re Hickory Printing Grp., Inc.)*, 479 B.R. 388, 397-98 (Bankr. W.D.N.C. 2012); *Peoples Bank of Ky., Inc. v. U.S. Bank, N.A. (In re S.J. Cox Enters., Inc.)*, Bankr. Case No. 07-50705, Adv. Pro. Case No. 08-5066, 2009 WL 939573, at *4-6 (Bankr. E.D. Ky. Mar. 4, 2009).

For example, in the case of *Negus-Sons*, the bankruptcy court held that Wells Fargo, a third party re-financing lender, was authorized by the bank that was the existing lender and secured creditor to file the termination statements at issue, when the bank executed a letter sent to it by Wells Fargo that sought the bank's consent to Wells Fargo's preparation of termination statements relating to two identified financing statements.  *Lange v. Mut. of Omaha Bank (In re Negus-Sons, Inc.)*, Bankr. Case No. 09-82518 (TJM), Adv. Pro. Case No. 10-8064 (TJM), 2011

54

WL 2470478, at *5 (Bankr. D. Neb. June 20, 2011), *aff'd*, 460 B.R. 754 (B.A.P.

8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012).  According to the bankruptcy

court, "[b]ecause the bank authorized Wells Fargo to file termination statements,

the bank's [UCC] financing statements were in fact terminated."  *Id*.  In arriving at

this holding, the bankruptcy court noted that the:

> correspondence between the bank and Wells Fargo is
> clear that the [UCC] "amendments" Wells Fargo
> intended to file upon the bank's authorization would
> terminate the bank's security interest "in all the
> collateral."  The bank representative consented in writing
> to this arrangement.  If he had questions about the scope
> of the release or termination of the bank's interests, he
> could have contacted Wells Fargo for clarification.  One
> who signs a document is presumed to have read that
> document and is bound by its terms.

*Id*.  The court found that the bank was bound by its consent to the filing of the

termination statements, even though, due to its own mistake, it did not intend to

terminate the entirety of its security interest.  *Id*.  The same result should follow

here.  JPMorgan should be bound by its consent to the filing of the 2008

Termination Statement, even though it did not appreciate the consequences at the

time or intend to cause the security interest in the collateral securing the Term

Loan to become unperfected.

Similarly, the bankruptcy court in *Hickory Printing* analyzed whether a

termination statement filed by the secured lender's employee was authorized to be

filed and therefore legally effective.  *See In re Hickory Printing Grp., Inc.*, 479

B.R. at 396 (bank's employee "filed hundreds of termination statements, followed her normal (and apparently approved) procedures when filing the Termination Statement, and intended to terminate the Original Financing Statement."). Although the secured lender initially argued that the filing was unauthorized, the court explained that while the employee "may or may not have made a mistake in filing the Termination Statement (given that the Bank still had a loan outstanding), her mistake in no way implies lack of authorization to file the Termination Statement." *Id.* at 397. For the same reason, JPMorgan's mistake in consenting to the filing of the 2008 Termination Statement by Mayer Brown (given that the Term Loan was still outstanding) in no way implies lack of authorization to file the 2008 Termination Statement.

Even the *A.F. Evans* case, relied upon by the Bankruptcy Court, supports the conclusion that termination statements containing errors are legally effective under revised Article 9 of the UCC. *In re A.F. Evans Co.*, No. 09-41727 (EDJ), 2009 WL 2821510 (Bankr. N.D. Cal. July 14, 2009), *aff'd sub nom. Official Comm. of Unsecured Creditors v. City Nat'l Bank*, No. C09-03817 (MMC), 2011 WL 1832963 (N.D. Cal. May 13, 2011). In *A.F. Evans*, the borrower prepared draft UCC termination statements for review by the secured lender. *Id.* at *1. The draft termination statements properly indicated that the lender's security interest in only two specified properties would be terminated, leaving the lender with a perfected

56

security interest in a third property.  *Id.*  Notably, the draft UCC forms did not

contain an "X" in box number 2 of the UCC form, which would have indicated that

the lender's entire security interest in all three properties was being terminated.  *Id.*

After the secured lender transmitted these approved UCC forms to the escrow

agent for filing, someone (presumed, but not established, to be the escrow agent)

checked the termination box before filing the UCC termination statement.  *Id.* at

*3.

In ruling that the lender's perfected security interest in the third property was

not terminated by the UCC filing, the court relied upon the fact that the UCC form

transmitted to the escrow agent did not have the termination box checked, and that

the filed form thus differed from the form approved by the lender.  *Id.*  In *A.F.*

*Evans*, the court concluded that the filing was unauthorized, because the

termination statement was filed in a form that was not approved by the secured

party.  *Id.* at *4.

Here, the 2008 Termination Statement was filed in exactly the same form in

which it had been transmitted to JPMorgan before it was filed.  Thus, unlike *A.F.*

*Evans*, this is not an "unauthorized modification" case, *id.*, because the filed

version of the 2008 Termination Statement is identical to the draft version that

JPMorgan received and approved prior to its filing.  There were no surprise or

unreviewed alterations or modifications to the 2008 Termination Statement

57

between the time that JPMorgan and its counsel received it for review and the time
it was filed. Unlike *A.F. Evans*, there is no basis for JPMorgan to shift the blame
to its agent, Mayer Brown, and argue that due to Mayer Brown's own error, the
filing of the 2008 Termination Statement was unauthorized.[12] Here, the mistake is
the responsibility of the secured lender/principal (JPMorgan), which approved the
filing of the 2008 Termination Statement in precisely the same form as it had been
presented for approval.

## E.     Mutual Mistake Is Not Applicable

The Bankruptcy Court's Decision in this case is tantamount to a ruling that
the filing of the 2008 Termination Statement was legally ineffective because of the
mutual mistake of JPMorgan, GM, and their respective counsel. According to the
Bankruptcy Court, because all parties were mistaken in their belief that the 2008
Termination Statement related to the 2001 synthetic lease financing, the filing of
the 2008 Termination Statement could not have been authorized by JPMorgan.

---

[12] Indeed, in distinguishing the facts of *A.F. Evans* from the facts of *Pacific Trencher*, the *A.F. Evans* court noted that the "error in *Pacific Trencher* was the secured party's error, and did not involve an unauthorized act by an escrow agent." *In re A.F. Evans Co.*, 2009 WL 2821510 at *5. Accordingly, in *Pacific Trencher*, the secured lender's mistake laden termination statement was held to be legally effective as a matter of law. *In re Pac. Trencher & Equip., Inc.*, 27 B.R. at 168. So too in this case, the filing of the 2008 Termination Statement resulted from JPMorgan's error. JPMorgan and its counsel received the 2008 Termination Statement in its final form and authorized its filing through, among other things, email communications and a written escrow letter that released the 2008 Termination Statement to Mayer Brown upon the closing of the Synthetic Lease Payoff.

58

The Bankruptcy Court's analysis was wrong, however, because to the extent the doctrine of mutual mistake is even relevant here, the intervening bankruptcy of GM destroyed the mutuality of the parties. In *Kitchin,* the Fourth Circuit addressed the argument that a termination statement should be reformed because of mutual mistake. *In re Kitchin Equip. Co. of Va., Inc.*, 960 F.2d at 1249. Rejecting that argument, the court noted that "the mistake was made in the context of a system designed to give notice to third parties who, by definition, could not be party to the mistake. In addition, the mutuality of the mistake, if any, has been destroyed by the intervening . . . bankruptcy, which gave the trustee the avoiding powers of a hypothetical lien creditor without knowledge of agreements between the parties." *Id*; *see also In re Pac. Trencher & Equip., Inc.*, 27 B.R. at 168 ("[T]he equitable doctrines of mistake and reformation are not available to alter clear language of [UCC] filings when reformation is violative of the policies behind the [UCC] filing system.").

Moreover, in the UCC context, "courts interpreting the UCC have uniformly held that principles of equity cannot be used to supplant or alter the UCC's provisions governing the creation, perfection and priority of security interests." *ACF 2006 Corp. v. Merritt*, No. CIV-12-161, 2013 WL 466603, at *4 (W.D. Okla. Feb. 7, 2013); *In re Lortz*, 344 B.R. 579, 585 (Bankr. C.D. Ill. 2006) (noting creditor's argument that it did not intend to release its security interest "is simply

59

another way of saying that the lien was released by mistake" but "[a]s with all perfection laws, however, which focus on third party perceptions and clarity and certainty of notice, the intent of the secured party is not relevant to questions of perfection and errors can be fatal"). The same holds true here, and for the same reasons, JPMorgan's mistake in consenting to the filing of the erroneous 2008 Termination Statement does not render that document legally ineffective.

## F.   The UCC Remains A System Designed To Give Public Notice

According to the Bankruptcy Court, the 2001 revisions to Article 9 of the UCC, which allowed termination statements to be filed by authorized persons on behalf of secured parties of record, require potential creditors to investigate the facts and circumstances surrounding the filing of UCC termination statements to confirm that any prior security interests against a borrower were terminated at the direction of secured creditors fully cognizant of the legal consequences of their actions. (SPA70). The Bankruptcy Court's view is impractical and, in addition to being in direct conflict with the conclusions reached by other courts about the operation of the UCC's public filing system, it is contrary to the overarching public policy that potential creditors are entitled to rely on properly filed records maintained under the UCC system. *See, e.g.*, *Roswell*, 2010 WL 3452378 at *7 ("Potential creditors must be able to rely on termination statements filed in the public record . . . ."); *Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re*

60

*Clean Burn Fuels, LLC)*, 492 B.R. 445, 465 (Bankr. M.D.N.C. 2013) ("The [UCC] permits third parties to rely on the record to determine whether a perfected security interest exists."); *see also In re Silvernail Mirror & Glass, Inc.*, 142 B.R. at 989 ("The Termination Statement gave all indications to the world that [the creditor] was terminating its security interest in all its collateral. The filing of a Termination Statement is a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the public records.").

As the *ACF* court noted, "[a]lthough strict adherence to the [UCC] requirements may at times lead to harsh results, efforts by courts to fashion equitable solutions for mitigation of hardships experienced by creditors in the literal application of statutory filing requirements may have the undesirable effect of reducing the degree of reliance the market place should be able to place on the [UCC] provisions. The inevitable harm doubtless would be more serious to commerce than the occasional harshness from strict obedience." *ACF 2006 Corp.*, 2013 WL 466603 at *4. Likewise, the Bankruptcy Court's Decision, if upheld, will undermine the public notice system that is central to the UCC and thereby introduce uncertainty and disruption to the secured lending markets.

## **CONCLUSION**

The Judgment below should be reversed, and the case remanded with instructions to grant summary judgment in favor of the Trust.

Dated: New York, New York
        September 17, 2013


                                    DICKSTEIN SHAPIRO LLP


                        By:
                                _/s/ Eric B. Fisher_____
                                Barry N. Seidel
                                Eric B. Fisher
                                Katie L. Weinstein
                                DICKSTEIN SHAPIRO LLP
                                1633 Broadway
                                New York, New York 10019
                                Telephone: (212) 277-6500
                                Facsimile: (212) 277-6501
                                Email: fishere@dicksteinshapiro.com

                                and

                                Jeffrey Rhodes
                                DICKSTEIN SHAPIRO LLP
                                1825 Eye Street, NW
                                Washington, D.C. 20006
                                Telephone: (202) 420-3150

                                *Attorneys for Plaintiff-Appellant*

62

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2013, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. I further certify that I will cause 6 paper copies of this brief to be filed with the Court.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: New York, New York
      September 17, 2013

                By:

                    /s/ Eric B. Fisher
                    Eric B. Fisher
                    DICKSTEIN SHAPIRO LLP
                    1633 Broadway
                    New York, NY 10019
                    Telephone: (212) 277-6500
                    Facsimile: (212) 277-6501
                    Email: fishere@dicksteinshapiro.com

                    *Attorneys for Plaintiff-Appellant*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.


Dated:  New York, New York
        September 17, 2013

                              By:
                                    /s/ Eric B. Fisher
                                    Eric B. Fisher
                                    DICKSTEIN SHAPIRO LLP
                                    1633 Broadway
                                    New York, NY 10019
                                    Telephone:  (212) 277-6500
                                    Facsimile:  (212) 277-6501
                                    Email:  fishere@dicksteinshapiro.com

                                    *Attorneys for Plaintiff-Appellant*

64