# 13-2187-BK

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

IN RE: MOTORS LIQUIDATION COMPANY, *et al.*,

*Debtors.*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF MOTORS LIQUIDATION COMPANY,

*Plaintiff-Appellant,*

*v.*

JPMORGAN CHASE BANK, N.A., INDIVIDUALLY AND AS ADMINISTRATIVE AGENT
FOR VARIOUS LENDERS PARTY TO THE TERM LOAN AGREEMENT DESCRIBED HEREIN,

*Defendant-Appellee.*

*On Appeal from the United States Bankruptcy Court
for the Southern District of New York (New York City)*

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

Eric B. Fisher
Barry N. Seidel
Katie L. Weinstein
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York 10019
(212) 277-6500
   *and*
Jeffrey Rhodes
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, D.C. 20006
(202) 420-3150

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ...................................................................1

ARGUMENT ...............................................................................................5

A.   For A Termination Statement To Be Effective, Its Filing Must
Have Been Authorized By The Secured Creditor ...........................5

B.   The Undisputed Facts Establish That JPMorgan Authorized The
Filing Of The 2008 Termination Statement ....................................5

    1.   JPMorgan Authorized The Act Of Filing The 2008
Termination Statement ..........................................................6

    2.   JPMorgan Manifested Its Assent To The Filing Of The
2008 Termination Statement, And GM's Counsel
Reasonably Believed, At The Time Of The Synthetic
Lease Payoff, That It Was Authorized To File ......................9

C.   The Termination Agreement Did Not "Restrict" Or "Bar" The
Filing Of The 2008 Termination Statement ...................................20

D.   Secured Creditors Are Bound By Their Mistakes Under
Revised Article 9 Of The UCC .....................................................24

CONCLUSION .........................................................................................29

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Bank of New York v. Alderazi*, 28 Misc. 3d 376 (N.Y. Sup. Ct. 2010) ...................20

*Bryan v. State-Wide Ins. Co.*, 144 A.D.2d 325 (2d Dep't 1988) .............................20

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 452 F.
    Supp. 1108 (S.D.N.Y. 1978).........................................................................18, 19

*Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d
    1242 (4th Cir. 1992).......................................................................................24

*DeMarco v. Edens*, 390 F.2d 836 (2d Cir. 1968)..................................................9, 21

*Ellicott Mach. Co. v. United States*, 44 Ct. Cl. 127 (1909) .....................................20

*Goger v. Merch. Bank of Atlanta (In re Feifer Indus., Inc.)*,
    155 B.R. 256 (Bankr. N.D. Ga. 1993) ...............................................................25

*Guidi v. Inter-Cont'l Hotels Corp.*, No. 95 Civ. 9006 (LAP), 2003 WL
    1878237 (S.D.N.Y. Apr. 14, 2003)......................................................................20

*In re Lortz*, 344 B.R. 579 (Bankr. C.D. Ill. 2006) .................................................7, 8

*In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987 (Bankr. M.D. Fla.
    1992) .............................................................................................................24

*In re Wells*, 129 Misc. 2d 56 (N.Y. Sur. Ct. 1985) ..................................................20

*Koehring Co. v. Nolden (In re Pac. Trencher & Equip., Inc.)*, 27 B.R.
    167 (B.A.P. 9th Cir. 1983), *aff'd*, 735 F.2d 362 (9th Cir. 1984)......................24

*Lange v. Mut. of Omaha Bank (In re Negus-Sons, Inc.)*, Bankr. Case
    No. 09-82518 (TJM), Adv. Pro. Case No. 10-8064 (TJM), 2011
    WL 2470478 (Bankr. D. Neb. June 20, 2011), *aff'd*, 460 B.R. 754
    (B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012)................................8

*Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*,
    269 F. Supp. 2d 206 (S.D.N.Y. 2003) ...........................................................23, 24

ii

*Paccar Fin. Corp. v. Benton Tucking Serv., Inc. (In re Benton Trucking Serv., Inc.)*, 21 B.R. 574 (Bankr. E.D. Mich. 1982) ........................... 25

*Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York Chem. Indus., Inc.)*, 30 B.R. 583 (Bankr. D.S.C. 1983) ................................. 24

**STATUTES**

Del. Code Ann. tit. 6, § 9-509(d)(1) .......................................................... 6

Del. Code Ann. tit. 6, § 9-510(a) ........................................................ 6, 27

**OTHER AUTHORITIES**

Harry C. Sigman, *The Filing System Under Revised Article 9,* 73 Am. Bankr. L.J. 61 (1999) ........................................................... 26

Restatement (Third) of Agency § 1.03 (2006) ......................................... 21

Restatement (Third) of Agency § 2.02 (2006) .................................... 9, 16

## PRELIMINARY STATEMENT

The gulf between the parties to this appeal is not as wide as JPMorgan[1] (or proposed *amicus curiae* Commercial Finance Association ("CFA")) pretends. For example, there is no dispute about the first issue identified by JPMorgan in its counter-statement of issues. The Committee agrees that the Bankruptcy Court correctly held that, under Article 9 of the UCC, the filing of a termination statement is not effective unless it has been authorized by the secured party of record. This was the law before the 2001 revisions to Article 9, which eliminated the requirement that the secured party sign the filing, and it remains the law today. The overheated rhetoric by JPMorgan and the CFA to the effect that the Committee is seeking to "topple this pillar of secured finance" (Amicus Br. 2) is patently false and is an effort to deflect attention from the more mundane issue that drives the correct result here: whether JPMorgan authorized the filing of the 2008 Termination Statement.

In addressing itself to the critical question of whether JPMorgan authorized the filing of the 2008 Termination Statement (a matter as to which the CFA says it takes no position), JPMorgan, like the Bankruptcy Court in its Decision, focuses on an irrelevant question. JPMorgan focuses on whether, at the time that the

---

[1]     Unless otherwise stated, defined terms shall have the meanings given to them in the Committee's opening brief.

Synthetic Lease was paid off, it intended to bring about the legal consequences of terminating the perfection of its security interest in the collateral that secured the Term Loan. Of course, it did not. But that is because JPMorgan made a mistake in authorizing Mayer Brown to file the 2008 Termination Statement. That is a far cry from saying that the filing was not authorized, and the distinction between "mistake" and "lack of authorization" makes all the difference in this case.

JPMorgan's repeated statements that neither GM nor Mayer Brown believed they were authorized to file a termination statement relating to the Term Loan are entirely beside the point. This is because, as JPMorgan also repeatedly acknowledges, no one realized at the time of the Synthetic Lease Payoff that the 2008 Termination Statement was erroneously included among the closing documents – again, confirming that this is a case about mistake.

The undisputed facts demonstrate that JPMorgan authorized Mayer Brown to file the 2008 Termination Statement. Through emails, escrow instructions, a closing checklist, and a pre-filing review and approval of the 2008 Termination Statement, JPMorgan manifested its assent to the filing of that document in the official Delaware state records. Mayer Brown, based on JPMorgan's manifestations of assent to the filing and its understanding at the time of the transaction that the 2008 Termination Statement was properly included among the

2

documents prepared and approved for the Synthetic Lease Payoff, reasonably believed it was authorized to file that specific document.

This case is indistinguishable from numerous other UCC cases in which a secured party mistakenly caused the filing of a termination statement. Those cases consistently hold that the secured party bears the consequences of its own mistake. Importantly, and contrary to JPMorgan's radical position on appeal, this well-established case law has not been abrogated by the ministerial 2001 revisions to Article 9 of the UCC that eliminated the requirement that termination statements be signed by the secured party of record. Both before and after the 2001 amendments, and regardless of whether or not a secured party signs the document, the filing of a termination statement must be authorized to be effective. If authorized, the filing of a termination statement is effective, even if the filing was a mistake.

The Bankruptcy Court's Decision allows a secured party to immunize itself from the consequences of its own mistakes by using an agent to carry out its instructions. Under the Bankruptcy Court's erroneous reading of UCC law, secured parties will always contend that an authorized but mistaken filing by an agent was not "authorized" because the consequences of the filing were not intended. This is contrary to law, obliterating an established body of authority that recognizes the effectiveness of authorized, but erroneous, UCC filings. If upheld,

3

the Decision will allow secured creditors to escape the consequences of their authorized, but mistaken, UCC filings, simply because those filings were accomplished by agents.

JPMorgan and CFA urge this Court to abandon the settled, bright line rule holding secured lenders responsible for their mistaken UCC filings, and suggest that reversing the Bankruptcy Court's Decision will do violence to the UCC notice system. This is simply not the case. Once a new lender satisfies itself that the filing of a termination statement has been authorized by the secured party, it should be able to trust in the effectiveness of the filing without having to ponder whether the termination statement is mistaken. Conversely, because secured lenders are not bound by the effects of unauthorized termination filings, they will not be required, as CFA speculates, to constantly check the official UCC records to verify that their liens are perfected. The question before this Court – whether authorized, mistaken filings are legally effective – is a narrow one. The answer to that question is yes.

When all of the circumstances are considered in accordance with the agency law principles established by this Court, it is undisputed that GM and Mayer Brown reasonably believed at the time of the Synthetic Lease Payoff, based on JPMorgan's direct manifestations, that they were authorized to file the 2008 Termination Statement. The subsequent realization that the filing was a mistake

4

did not nullify that authority. Accordingly, the Judgment below should be reversed.

## ARGUMENT

### A. For A Termination Statement To Be Effective, Its Filing Must Have Been Authorized By The Secured Creditor

JPMorgan's brief pretends there is disagreement where there is none. The parties to this appeal agree that the only effective UCC termination statement filings are those that are authorized by the secured party of record. Contrary to JPMorgan's and CFA's mischaracterization of the Committee's argument, the Committee has never argued for the effectiveness of unauthorized filings. JPMorgan's invention of this "straw man" argument is a telling effort to deflect attention from the weakness of its position and the fundamental issue that is genuinely in dispute: whether the Bankruptcy Court erred in concluding that JPMorgan did not authorize the filing of the 2008 Termination Statement.

### B. The Undisputed Facts Establish That JPMorgan Authorized The Filing Of The 2008 Termination Statement

In addressing the only issue that really matters on this appeal – whether JPMorgan authorized the filing of the 2008 Termination Statement – JPMorgan simply repeats the Bankruptcy Court's error, urging a reading of Article 9 of the UCC that is contrary to the plain and unambiguous language of the statute. JPMorgan quotes from the Bankruptcy Court's Decision:

5

> When an agent acts on behalf of a secured lender
> principal to terminate an initial financing statement with
> respect to a financing, to be effective the termination
> must be *authorized* by the secured lender principal . . . .

(Appellee Br. 27 (quoting SPA7) (emphasis in original)). As explained in the

Committee's opening brief and immediately below, this erroneous recitation of the

law cannot be reconciled with the express terms of the relevant UCC provisions.

### 1. JPMorgan Authorized The Act Of Filing The 2008 Termination Statement

The plain language of the UCC requires the act of filing to be authorized, not

the legal consequence of the filing (*i.e.* the termination of the initial financing

statement). JPMorgan concedes this point, as it necessarily must, when it

acknowledges that "[p]ursuant to sections 9-509 and 9-510, a filing of a UCC-3

termination statement could be effective without any signature of a secured party

*provided that the filing was authorized by the secured party.*" (*Id.* at 28 (emphasis

in original)).

The terms of sections 9-509 and 9-510 are clear and consonant with the

Committee's position on appeal that it is only the act of filing that must be

authorized. *See* Del. Code Ann. tit. 6, § 9-510(a) ("the effectiveness of "*a filed

record*" requires that it be "*filed* by a person that may *file* it under Section 9-509")

(emphasis added); Del. Code Ann. tit. 6, § 9-509(d)(1) ("[a] person may *file* [a

termination statement] . . . only if . . . the secured party of record authorizes the

6

*filing . . . .*") (emphasis added). Undeterred by the unambiguous terms of the statute, JPMorgan still argues that the "actual text" of the UCC does not speak to the "physical 'act' of filing, irrespective of intent." (Appellee Br. 43). Neither the statute itself, nor the comments to the UCC, even suggest that the secured lender's intention to terminate a particular initial financing statement has any bearing at all on whether the secured lender has authorized the act of filing the termination statement.

This straightforward and logical reading of the UCC is consistent with the principles that underlie perfection laws. The case of *In re Lortz*, 344 B.R. 579 (Bankr. C.D. Ill. 2006), illustrates this point. In *Lortz*, due to the secured creditor's accounting error, its records reflected that the debtor's account had been paid in full, when in fact the secured creditor had received no collectible funds. As a result, the secured creditor mistakenly released its lien on a certificate of title to a motor vehicle that secured the obligation, and returned the title to the owner, thereby causing its security interest to become unperfected under Illinois law. *Id.* at 581. The bankruptcy court accepted the secured creditor's representation that "it did not intend to release its security interest for anything less than full payment of the loan, which is simply another way of saying that the lien was released by mistake." *Id.* at 585. Nonetheless, the bankruptcy court held that the secured

7

creditor's lien was unperfected, and that the secured creditor's intent was not

relevant:

> As with all perfection laws, however, which focus on
> third party perceptions and clarity and certainty of notice,
> the intent of the secured party is not relevant to questions
> of perfection and errors can be fatal.

*Id*.

As the bankruptcy court in *Lortz* further recognized, the mistaken release

of the creditor's security interest in that case was no different than "a mortgagee

who mistakenly records a release of mortgage in the county recorder's office." *Id*.

at 585 n.5 ("When bankruptcy intervenes during such period of unperfection, the

mistakenly released mortgage is avoidable by the trustee.").[2] The same holds true

for authorized, but mistaken, UCC termination statements filed by agents. *See*

*Lange v. Mut. of Omaha Bank (In re Negus-Sons, Inc.)*, Bankr. Case No. 09-82518

(TJM), Adv. Pro. Case No. 10-8064 (TJM), 2011 WL 2470478, at *5 (Bankr. D.

Neb. June 20, 2011) (lender bound by consent to filing of termination statement

---

[2] As explained in the Committee's opening brief (Appellant Br. 10), an unperfected security interest is trumped by the statutory lien under section 544(a) of the Bankruptcy Code in favor of GM that arose upon the filing of its bankruptcy petition. JPMorgan does not dispute this point. Accordingly, if the 2008 Termination Statement was legally effective (as the Committee contends), then JPMorgan's lien was unperfected as of the filing of GM's bankruptcy petition and is thus avoidable.

that released security interest in entirety of collateral although, due to its own mistake, it only intended partial release of collateral), *aff'd*, 460 B.R. 754 (B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012). For the same reason, JPMorgan's intent, and in particular its lack of intent to "unperfect" its security interest in the collateral securing the Term Loan, is irrelevant.

2.    **JPMorgan Manifested Its Assent To The Filing Of The 2008 Termination Statement, And GM's Counsel Reasonably Believed, At The Time Of <u>The Synthetic Lease Payoff, That It was Authorized To File</u>**

The parties to this appeal generally agree on the key legal principles of agency law, disagreeing only as to their proper application in this case. As explained in the Committee's opening brief, an agent acts with actual authority when the agent reasonably believes, based on the principal's manifestations of assent, that the principal wishes the agent to commit an act. (Appellant Br. 35-36). "Whether an agent's belief is reasonable is determined from the viewpoint of a reasonable person in the agent's situation under all of the circumstances of which the agent has notice." Restatement (Third) of Agency § 2.02 (2006) (cmt. e); *see also DeMarco v. Edens*, 390 F.2d 836, 844 (2d Cir. 1968). As JPMorgan acknowledges (*see* Appellee Br. 37), an agent's understanding is assessed as of the time of the act in question. *See* Restatement (Third) of Agency § 2.02 (2006) (cmt. e) ("An agent's understanding at the time the agent acts is controlling.").

9

The following facts are not disputed, and demonstrate conclusively that

JPMorgan authorized the filing of the 2008 Termination Statement:

- Richard Duker, the Managing Director at JPMorgan responsible for the Term Loan, and JPMorgan's counsel, received a written checklist indicating, in advance of its filing, that GM's counsel planned to file the 2008 Termination Statement. (SPA16; A2868, A2875, A2878, A2882, A3020).

- Mr. Duker and JPMorgan's counsel also received, in advance of the filing, a draft of the 2008 Termination Statement. (SPA18; A2885, 2907, A3029, A3052).

- In response to the documents received from GM's counsel, including, among others, the 2008 Termination Statement, JPMorgan's counsel sent an email to GM's counsel, prior to the filing, stating "[n]ice job on the documents." (SPA18; A921).

- On October 24, 2008, GM's counsel asked JPMorgan's counsel for comments to the draft escrow instructions, and JPMorgan's counsel replied that "it was fine." (SPA21; A934).

- JPMorgan's counsel executed written escrow instructions authorizing the release of the 2008 Termination Statement to GM's counsel upon the closing of the Synthetic Lease Payoff. (SPA19).

- On October 30, 2008, one of GM's attorneys told a paralegal with his firm to file the 2008 Termination Statement (SPA 22; A2653-54), and the paralegal thereafter told his contact at CT

10

Corp. to file the 2008 Termination Statement. (A3015-18, A2653-54).

- CT Corp. filed the 2008 Termination Statement with the Secretary of State for the State of Delaware before the Petition Date. (A2633; A2614-15).

- JPMorgan is identified as "THE SECURED PARTY OF RECORD AUTHORIZING" the 2008 Termination Statement (SPA17, 78), a designation that JPMorgan had occasion to review when the draft 2008 Termination Statement was sent to Messrs. Duker and Merjian. (SPA18; A2885, 2907, A3029, A3052).

The foregoing facts, when viewed in light of the applicable standards, demonstrate that JPMorgan authorized the filing of the 2008 Termination Statement, and that GM and its counsel reasonably believed, at the time of the transaction, that they were authorized to do so.

Indeed, the record before the Bankruptcy Court caused it to observe that "JPMorgan at least arguably consented to the filing." (SPA8). JPMorgan altogether fails to address this finding of the Bankruptcy Court, even though it is directly at odds with the Bankruptcy Court's decision to grant summary judgment in favor of JPMorgan on the faulty basis that, as a matter of law, the filing of the 2008 Termination Statement was not consented to by JPMorgan. It is illogical to find that the filing was "arguably" consented to by JPMorgan, on the one hand, and

11

to rule conclusively on summary judgment that the filing was not authorized by JPMorgan, on the other.

Faced with the incontrovertible facts proving that it authorized the filing of the 2008 Termination Statement, JPMorgan attempts to shift focus to an irrelevant issue, using clever drafting to mischaracterize the record, obscure the key legal question at issue in this case, and distance itself from its mistake. First, JPMorgan argues that GM and Mayer Brown "did not believe there was authority to file the Unrelated UCC-3" (Appellee Br. 31), or "a UCC-3 termination statement related to the Term Loan." (*Id*. at 19). This argument is completely beside the point, because it presumes that authority to file the 2008 Termination Statement could only have existed if JPMorgan's agent understood, at the time of the transaction, that the document *related* to the Term Loan. In advancing this argument, JPMorgan dodges the key legal issue in this case: whether Mayer Brown believed it was authorized to file the documents that JPMorgan and its counsel reviewed and approved, including the 2008 Termination Statement. The answer to this question, of course, is yes.

As Mayer Brown attorney Ryan Green testified, he believed, at the time, that the 2008 Termination Statement was within the "universe of documents" required for the Synthetic Lease Payoff. (A2635). As JPMorgan admits, the evidence is consistent that everyone involved actually believed at the time that all of the

12

documents, including all of the termination statements, related to the Synthetic Lease Payoff.  (*See, e.g.,* Appellee Br. 15, 16, 19).  But as JPMorgan itself recognizes, the parties' collective belief "that all of the Delaware UCC-1 financing statements referenced in the checklist pertained only to the Synthetic Lease Transaction . . . proved to be incorrect."  (*Id*. at 14).  JPMorgan's recognition that both JPMorgan and Mayer Brown were mistaken about the 2008 Termination Statement simply confirms that Mayer Brown reasonably believed, at the time of the transaction, that JPMorgan assented to the filing of that document, along with each of the other termination statements prepared for the Synthetic Lease Payoff.

JPMorgan alternatively frames its argument in a slightly different, yet equally misleading, fashion.  JPMorgan argues that "the Mayer Brown witnesses examined by the Committee uniformly confirmed that they did not believe that they had any authority to file *this document* [*i.e.* the 2008 Termination Statement]." (*Id*. at 38 (emphasis added)).  Here, JPMorgan addresses the correct legal issue, but misstates the record.  The undisputed facts set forth above demonstrate, beyond a doubt, that Mayer Brown reasonably believed JPMorgan authorized the filing of each of the termination statements included within the "universe of documents" (A2635), including the 2008 Termination Statement.  That neither JPMorgan, GM nor their respective counsel realized at the time that the document related to the

13

Term Loan has no bearing on whether or not the act of filing that document was authorized.

In addition to focusing improperly on the legal consequences instead of the act of filing, JPMorgan further evades the relevant issue by failing to focus on the reasonable belief of its agent at the time of the transaction. Although JPMorgan acknowledges, as it must, that the "focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding *at the time the agent takes action*" (Appellee Br. 37 (emphasis added)), JPMorgan asks this Court to consider the agent's belief as of a much later point in time – after the parties became aware of the mistake. JPMorgan's analytical error is illustrated by the testimony of Mayer Brown attorney Robert Gordon that JPMorgan emphasizes in its brief. (*Id*. at 20).

The problem lies in the way JPMorgan phrased its questions to Mr. Gordon: during the period of time he worked on the Synthetic Lease Payoff up until the present day, did anyone ever tell him, or did he ever form the belief, that he was authorized to file the 2008 Termination Statement? (*Id*.). Of course, any communication with Mr. Gordon, or any belief he held, at any point other than the time of the Synthetic Lease Payoff is irrelevant.

As to the relevant issue here – Mr. Gordon's belief at the time of the Synthetic Lease Payoff – his testimony that he did not believe he was authorized to

14

file the 2008 Termination Statement is contradicted by the other facts in the record that irrefutably demonstrate that Mayer Brown reasonably understood JPMorgan's clear instructions that each of the termination statements, including the 2008 Termination Statement, should be filed. *See supra*, at 10-11. It is undisputed that, at the time of the transaction, neither he nor anyone else realized that the 2008 Termination Statement was unrelated to the Synthetic Lease transaction and mistakenly included within the batch of documents prepared for the Synthetic Lease Payoff.

Accordingly, to the extent Mr. Gordon is testifying that he knew, at the time, that the 2008 Termination Statement was unrelated to the Synthetic Lease Payoff, that testimony is patently false, because if he had such contemporaneous knowledge, the 2008 Termination Statement would surely never have been filed. No one in this case has ever accused Mayer Brown of having filed the 2008 Termination Statement based on some frolic and detour or for the purpose of defrauding or otherwise disadvantaging JPMorgan. Rather, it was filed in good faith based on Mayer Brown's reasonable understanding of JPMorgan's manifestations of assent to the filing of that particular document.[3]

---

[3] Mr. Gordon's affidavit suffers from the same infirmities as his deposition testimony. As discussed in the Committee's opening brief (Appellant Br. 47-48), the differences between a draft and the final version of that affidavit make plain

Notwithstanding the undisputed facts evidencing JPMorgan's direct manifestations of assent and Mayer Brown's reasonable belief at the time of the Synthetic Lease Payoff, JPMorgan suggests that authority to file the 2008 Termination Statement is nonetheless lacking here because GM and its counsel did not appreciate the legal consequences of the parties' mistake. According to JPMorgan, under principles of agency law, GM and its counsel were required to understand JPMorgan's "interests and objectives," as well as the legal consequences of the act of filing the 2008 Termination Statement, in order to reasonably believe they were authorized to so act. (Appellee Br. 42-43). But the agency principles relied upon by JPMorgan are inapplicable under the circumstances of this case.

In support of its misplaced argument, JPMorgan quotes the Restatement (Third) of Agency § 2.02 (2006) (cmt. e):

> An agent's understanding of the principal's interests and objectives is an element of the agent's reasonable interpretation of the principal's conduct. If a literal

---

that Mayer Brown believed it was authorized to file the 2008 Termination Statement by circumstances other than the Termination Agreement. While it is true that the Termination Agreement does not speak to the filing of termination statements other than those relating to the Synthetic Lease, it is equally true that JPMorgan provided other manifestations of assent to the filing of the 2008 Termination Statement. *See infra* Section C. It is telling that those other manifestations of assent are not addressed in the final version of Mr. Gordon's affidavit.

16

> interpretation of a principal's communication to the agent
> would authorize an act inconsistent with the principal's
> interests or objectives known to the agent, it is open to
> question whether the agent's literal interpretation is
> reasonable.

(Appellee Br. 42 (emphasis omitted)).  These principles do not, however, suggest a

lack of authority here, because it is undisputed that none of the parties involved,

including Mayer Brown, had any awareness at the time of the transaction that

JPMorgan's communications to its agent were authorizing an act inconsistent with

JPMorgan's interests or objectives *known to the agent*.  Indeed, at the time that

JPMorgan authorized the filing, not only was its agent unaware of the

consequences of the filing, but JPMorgan itself was unaware that the act it was

authorizing would have unintended legal consequences.  There is no doubt that, at

the time of the Synthetic Lease Payoff, no one understood or appreciated that

JPMorgan had approved the filing of a termination statement that would result in

the termination of the 2006 Financing Statement.  But this does not mean that the

filing of the 2008 Termination Statement was not authorized.[4]

---

[4]     JPMorgan also quotes other comments from the Restatement which address
situations where a principal's instructions "leave room for the agent to exercise
discretion," or where a principal may have "authorized the commission of
collateral acts" that could have "major legal implications for the principal."
(Appellee Br. 42-43).  But in the case at hand, the agent did not exercise any
discretion or commit any collateral acts.  To the contrary, Ryan Green followed

17

In effect, JPMorgan is attempting to impose on its agent a higher level of knowledge and awareness about the underlying facts of the transaction than it had itself. But this position is unreasonable. In the face of its clear manifestations of assent to the filing of the 2008 Termination Statement (*see supra*, at 10-11), it is unreasonable to expect that the agent would believe under those circumstances that it was authorized to file all but one of the termination statements included in the "universe of documents" prepared for the Synthetic Lease Payoff.

Moreover, the fact that JPMorgan, GM and their respective counsel failed to realize that the 2008 Termination Statement related to the Term Loan (and not the Synthetic Lease) does not render the filing of that document ineffective. Even if the mistake is somehow laid at the feet of GM and Mayer Brown, JPMorgan would still be bound, notwithstanding that the "granting of the authority was the result of . . . misinformation, oversight or negligence on the part" of JPMorgan's agents. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 452 F. Supp. 1108, 1114 (S.D.N.Y. 1978). As the district court in *Vintero Sales Corp.* observed:

> Where authority is stated to be conditioned upon the existence of specified facts, the agent may be authorized to act if he is reasonable, although mistaken, in believing such facts to exist. If the agent is unreasonable in believing such facts to exist, he is unauthorized to act for

JPMorgan's instructions to the letter, and the filing of termination statements prepared at the time of the Synthetic Lease Payoff were not collateral acts.

18

> the principal. Nevertheless, the principal is bound by the agent's act as in other situations involving negligent mistakes by agents.

*Id.* at 1115 (quoting Restatement (Second) of Agency § 165A (1958) (cmt. a)).

Here, it is undisputed that both the principal and agent were mistaken about the inclusion of the 2008 Termination Statement with the Synthetic Lease Payoff documents. Nonetheless, based on JPMorgan's direct manifestations of assent, it was objectively reasonable for GM and Mayer Brown to believe, at the time of the transaction, that they were authorized to file the 2008 Termination Statement. Although the filing of that document was ultimately discovered to be a mistake, JPMorgan is bound by its agent's authorized, but mistaken, act.

Pulling out all the stops, JPMorgan also argues that it was not represented by Simpson Thacher with respect to the Term Loan, and therefore cannot be bound by the firm's actions. (Appellee Br. 49-50). This argument is without merit. The mistaken filing of the 2008 Termination Statement occurred in the context of the Synthetic Lease Payoff, and it is undisputed that Simpson Thacher represented JPMorgan in connection with that transaction. (SPA9). Moreover, the scope of Simpson Thacher's representation of JPMorgan was generally broad (A2680), and with respect to the Synthetic Lease Payoff, Simpson Thacher was acting in the absence of any engagement letter that limited the scope of the representation. (A2689). Furthermore, when Simpson Thacher approved the filing of the 2008

19

Termination Statement through email approvals and the escrow instructions,

Simpson Thacher was acting with the knowledge of Mr. Duker at JPMorgan at all

times.  (SPA18, 42; A921, A2628-30).[5]

**C.    The Termination Agreement Did Not "Restrict"
        Or "Bar" The Filing Of The 2008 Termination Statement**

JPMorgan, like the Bankruptcy Court, focuses on the Termination

Agreement and deems it to be the sole and exclusive source of authority for the

filing of the UCC-3 termination statements.  (Appellee Br. 39).  But focusing

solely on the Termination Agreement, and ignoring JPMorgan's other

manifestations of assent to the filing of the 2008 Termination Statement, is

contrary to the law of this Circuit, which holds that "the extent of the agent's actual

---

[5]    The cases cited by JPMorgan are distinguishable and do not support its
argument that it is not bound by the acts of its counsel, particularly where those
acts were performed with JPMorgan's knowledge and approval.  *See Guidi v.
Inter-Cont'l Hotels Corp.*, No. 95 Civ. 9006 (LAP), 2003 WL 1878237 (S.D.N.Y.
Apr. 14, 2003) (filings by Egyptian attorney in Egyptian proceeding did not bind
client because Egyptian attorney was under explicit instructions that no filings
could be made without prior approval of U.S. counsel); *In re Wells*, 129 Misc. 2d
56 (N.Y. Sur. Ct. 1985) (client not bound by unilateral actions of attorney in appeal
because client had never been made aware of appeal); *Bryan v. State-Wide Ins.
Co.*, 144 A.D.2d 325 (2d Dep't 1988) (plaintiff not bound by actions of attorney
waiving plaintiff's rights of which plaintiff had no knowledge); *Bank of New York
v. Alderazi*, 28 Misc. 3d 376 (N.Y. Sup. Ct. 2010) (nominee's assignment of
mortgage unauthorized because nominee only designated to act in limited fashion);
*Ellicott Mach. Co. v. United States*, 44 Ct. Cl. 127 (1909) (contract upheld despite
agent's mistake because party cannot set up its own negligence and assert mutual
mistake).

authority is interpreted in the light of all the circumstances attending" the manifestations. *DeMarco*, 390 F.2d at 844; *see also* Restatement (Third) of Agency § 1.03 (2006) (cmt. e) (noting "[i]n some circumstances, a manifestation may be made by conduct alone or by conduct that carries meaning at odds with words expressed previously or simultaneously").

When all of the circumstances are duly considered, it is evident that the Bankruptcy Court erred in finding that the Termination Agreement was the only direct manifestation of authority by JPMorgan. In addition to the authority granted in the Termination Agreement with respect to the UCC filings, JPMorgan and its counsel also provided authority to file the 2008 Termination Statement by, among other things, reviewing the draft of that document and expressly approving it by email. JPMorgan further manifested its assent to the filing of the 2008 Termination Agreement when JPMorgan and its counsel reviewed and approved the drafts of the closing checklist and escrow instructions. *See supra*, at 10-11.

Furthermore, and for the reasons discussed above, the "agent's testimony" and the testimony of other witnesses do not support a finding that authorization was lacking, or that GM and its counsel did not reasonably believe that JPMorgan authorized the filing of the 2008 Termination Statement. (Appellee Br. 44). The "agent's testimony" upon which JPMorgan relies does not accurately reflect what GM and Mayer Brown understood at the time of the transaction, but rather reflects

21

the irrelevant issue of their understanding more than one year later, after the mistake was brought to their attention. *See supra*, at 12-15.

Moreover, the affidavit submitted by GM's Debra Homic Hoge also fails to address the key facts relating to the issue of authorization, including the review and approval by JPMorgan of the draft 2008 Termination Statement and the other closing documents, including the closing checklist and the escrow instructions. (A3126-29). When all of the circumstances are properly considered, it is evident that JPMorgan authorized the filing of all of the documents that were prepared, circulated and approved at the time of the Synthetic Lease Payoff, and that Mayer Brown reasonably believed JPMorgan authorized the filing of each of those documents, including the 2008 Termination Statement.[6]

More fundamentally, the Bankruptcy Court erred in considering Ms. Hoge's affidavit, which is inadmissible because it fails to establish that it is based on contemporaneous or personal knowledge. There is no evidence that Ms. Hoge was involved in the Synthetic Lease Payoff (other than as signatory to the Termination

---

[6]    Thus, this is not a situation, as JPMorgan argues, where a written instrument is "dispositive." (Appellee Br. 39 n.9). When all of the circumstances are considered, as required under the law of this Circuit, there is no doubt that Mayer Brown reasonably believed that JPMorgan assented to the filing of the 2008 Termination Statement.

Agreement) or has any personal knowledge regarding what the parties reasonably understood at the time of that transaction.

Finally, and contrary to JPMorgan's contention, there is nothing in the Termination Agreement that "barred" the filing of the 2008 Termination Statement or otherwise "restricted" the filing of any class or type of termination statements. (Appellee Br. 4, 24). That agreement does not state that it is the "sole" or "exclusive" grant of authority. The agreement does not contain a merger or integration clause, and does not otherwise have the characteristics of an "integrated" agreement, as JPMorgan suggests. (*Id.* at 41).[7]

---

[7] The case cited by JPMorgan, *Morgan Stanley High Yield Securities, Inc. v. Seven Circle Gaming Corp.,* 269 F. Supp. 2d 206, 214 (S.D.N.Y. 2003), does not support a finding that the Termination Agreement is an integrated agreement. As the district court stated in that case, whether the parties intend an agreement to be integrated is determined "by reading the writing in light of the surrounding circumstances." *Id.* (internal quotation marks omitted). Here, the sheer volume of documents involved in the Synthetic Lease Payoff indicates the absence of any intent to create a single integrated agreement. Moreover, the factors courts generally consider to determine whether such intent exists are not present in this case. The Termination Agreement is not a "specially drawn out and executed agreement" that "the parties and their counsel negotiated during a lengthy period," *id.*, and does not include language that otherwise suggests the requisite intent, such as "in consideration of the mutual promises herein contained, it is agreed and covenanted as follows," or "the foregoing correctly sets forth your understanding of our Agreement." *Id.* (quoting *Adler & Shaykin v. Wachner*, 721 F. Supp. 472, 477 (S.D.N.Y. 1988)). And, unlike the agreement at issue in *Morgan Stanley*, the Termination Agreement does not contain language of the following type, which courts have found to support a finding of integration: "[e]ach party represents and

**D.    Secured Creditors Are Bound By Their**
**Mistakes Under Revised Article 9 Of The UCC**

Following the Bankruptcy Court's lead, JPMorgan adopts the radical

position that the 2001 UCC amendments' elimination of the signature requirement

for ministerial reasons has resulted in the abrogation of the consistent line of pre-

2001 cases about mistake.[8]  This contention, however, is based on the erroneous

assumption that the 2001 revisions effected a fundamental change to the UCC

notice filing system.  This is not the case, however, and the Bankruptcy Court's

conclusion that the revised Article 9 established a new "regime" that tolerates

mistakes by secured creditors who utilize agents to file termination statements

finds no support in the law.  (SPA6).

The fallacy of this premise is revealed by the Bankruptcy Court's statement

that "[u]nder Article 9 of the UCC as it was amended in 2001, the termination of a

UCC-1 is ineffective unless it has been authorized."  (SPA6).  But this statement

ignores the fact that even prior to the 2001 amendments, the filing of a termination

---

warrants to the other that this Agreement is its legal, valid and binding obligation
enforceable against it in accordance with its terms."  *Id*. at 215.

[8]    *See generally Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*,
960 F.2d 1242 (4th Cir. 1992); *Koehring Co. v. Nolden (In re Pac. Trencher &
Equip., Inc.)*, 27 B.R. 167 (B.A.P. 9th Cir. 1983), *aff'd*, 735 F.2d 362 (9th Cir.
1984); *In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987 (Bankr. M.D. Fla.
1992); *Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York Chem. Indus.,
Inc.)*, 30 B.R. 583 (Bankr. D.S.C. 1983).

statement had to be authorized in order to be effective. As JPMorgan acknowledges, the 2001 amendments did not create a new standard, but rather only "reaffirmed that such filings must be 'authorized' to be effective." (Appellee Br. 2).

Thus, the requirement that termination statements must be authorized to be effective existed even before the 2001 amendments. The case of *Goger v. Merchants Bank of Atlanta (In re Feifer Indus., Inc.)*, 155 B.R. 256 (Bankr. N.D. Ga. 1993), relied upon by JPMorgan (Appellee Br. 31), confirms this. In *Goger*, one secured lender filed a termination statement that, in addition to terminating its own security interest, also purported to terminate the security interest of a second secured lender. The court ruled that the termination statement was ineffective as to the second lender because there was "no written or parol evidence regarding the *actual authority*" of the first lender to terminate the security interest of the second lender. *Id*. at 261 (emphasis added). It is therefore clear that the requirement that filings be authorized existed even when secured creditors were required to sign termination statements prior to filing.[9]

---

[9]     The fact that UCC filings were required to be authorized even before the 2001 revisions to Article 9 is further confirmed by pre-2001 case law holding that forged termination statements, even though bearing the apparent signature of the secured creditor, are not effective because they were filed without authority. *C.f. Paccar Fin. Corp. v. Benton Tucking Serv., Inc. (In re Benton Trucking Serv.,*

25

The elimination of the signature requirement was a ministerial change to Article 9 designed to accommodate electronic and paperless filing.  *See* Harry C. Sigman, *The Filing System Under Revised Article 9*, 73 Am. Bankr. L.J. 61, 68 (1999).  There is nothing in the text, comments, or legislative history that in any way suggests that the elimination of the signature requirement was done in furtherance of a wholesale change to the operation of the UCC notice system. Even before the elimination of the signature requirement, a prudent potential secured lender would be well advised to perform appropriate due diligence to determine, for example, whether a filed termination statement was genuine and not a forgery.  In this sense, it is equally true, both before and after the 2001 Article 9 revisions, that the review of a filed termination statement is "the start – and not the end – of the judicial inquiry."  (SPA6).  But it is also equally true, both before and after the 2001 revisions, that a determination that the filing of the termination statement was authorized does in fact end the inquiry.

Contrary to the alarm sounded by CFA, the reversal of the Bankruptcy Court's Decision on the narrow basis of JPMorgan's authorized mistake will not require secured lenders to "constantly check the filing office records and verify its

---

*Inc.)*, 21 B.R. 574, 576 (Bankr. E.D. Mich. 1982) (holding that forged termination statements did not divest secured creditor of perfected security interest in motor vehicles).

26

priority liens," thereby driving up the cost of asset-based lending. (Amicus Br. 8). A secured lender is not required to take such steps because, as CFA acknowledges, lenders are "protected against an *unauthorized* termination of the financing statement (whether willful or inadvertent) by the borrower or any other party." (*Id*. at 2 (emphasis added)). A secured creditor need not be concerned with the filing of a termination statement that it did not truly authorize, because such a filing has no legal effect. *See* Del. Code Ann. tit. 6, § 9-510(a). But that is not the situation here. In this case, the filing of the 2008 Termination Statement was authorized, and even though that filing was a mistake, it is legally effective.[10]

In this case, and as set forth *supra*, at 10-11, the undisputed facts demonstrate that JPMorgan authorized the filing of the 2008 Termination Statement. That JPMorgan granted that authority due to the mistaken belief that the document related to the Synthetic Lease transaction does not alter this

---

[10] CFA's entire brief is premised on a blatant mischaracterization of the Committee's position in this case. Contrary to CFA's contention, the Committee has never argued that unauthorized filings are effective. The Committee's position is, and has consistently been, that: (1) authorized filings, even if mistaken, are effective; and (2) the UCC notice system does not require potential creditors who have ascertained that the filing of a termination statement was authorized by the secured party to take the additional step of confirming whether the secured creditor was "fully cognizant of the legal consequences" of its actions. (Appellant Br. 60).

conclusion.  This Court should reject JPMorgan's unfounded request to be relieved of the consequences of its authorized mistake.[11]

According to the Bankruptcy Court, the filing of the 2008 Termination Statement was not authorized by JPMorgan because JPMorgan was mistaken about the underlying subject matter of that termination statement.  Following the Bankruptcy Court's rationale to its logical conclusion, secured creditors who act through agents will always be relieved of the consequences of mistaken filings.  In every such instance, the secured creditor does not intend the consequences of the filing.  Of course, this is not the law, and the elimination of the signature requirement was not intended to upend the well-established UCC law on the effectiveness of mistaken filings.

The Bankruptcy Court's holding, if allowed to stand, would encourage a level of inattention and carelessness on the part of secured creditors and other UCC filers and would fundamentally undermine the reliability of the UCC notice filing system.  This Court should therefore reject the Bankruptcy Court's holding and

---

[11]     JPMorgan also advances the irrelevant argument that "a waiver of a creditor's rights cannot be lightly presumed."  (Appellee Br. 51-52).  The issue of waiver has no applicability here.  The cases cited by JPMorgan (*see id.* at 52) do not involve mistaken UCC filings, but rather only address the issue of waiver as a general matter.  As explained in the Committee's opening brief, there is clearly established authority that deals specifically with the issue of mistaken UCC-3 termination statements, and the cases involving erroneously filed termination statements do not excuse mistaken filings based on principles of waiver.

28

confirm that authorized filings of termination statements, such as the 2008

Termination Statement at issue here, are in fact effective and therefore "dramatic

and final."

## **<u>CONCLUSION</u>**

The Judgment below should be reversed, and the case remanded with

instructions to grant summary judgment in favor of the Committee.

Dated: New York, New York
     December 23, 2013

               DICKSTEIN SHAPIRO LLP

               By:

                    /s/ Eric B. Fisher
                    Barry N. Seidel
                    Eric B. Fisher
                    Katie L. Weinstein
                    DICKSTEIN SHAPIRO LLP
                    1633 Broadway
                    New York, New York 10019
                    Telephone:  (212) 277-6500
                    Facsimile:  (212) 277-6501
                    Email:  fishere@docksteinshapiro.com

                    and

                    Jeffrey Rhodes
                    DICKSTEIN SHAPIRO LLP
                    1825 Eye Street, NW
                    Washington, D.C. 20006
                    Telephone:  (202) 420-3150

                    *Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2013, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  I further certify that I will cause 6 paper copies of this brief to be filed with the Court.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated:  New York, New York
       December 23, 2013

/s/ Eric B. Fisher
Eric B. Fisher
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Telephone:  (212) 277-6500
Facsimile:  (212) 277-6501
Email:  fishere@dicksteinshapiro.com

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,923 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated:  New York, New York
       December 23, 2013

/s/ Eric B. Fisher
Eric B. Fisher
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Telephone:  (212) 277-6500
Facsimile:  (212) 277-6501
Email:  fishere@dicksteinshapiro.com

*Attorneys for Plaintiff-Appellant*

31